**In re ALCATEL USA, INC. f/k/a DSC Communications Incorporated, Relator.**

No. 98–1243.

Supreme Court of Texas.

Jan. 6, 2000.

Argued Dec. 1, 1999.

Decided Jan. 6, 2000.

Timothy S. Durst, Dallas, Bob E. Shannon, Austin, Joseph D. Cheavens, Houston, Joseph R. Knight, Joe R. Greenhill, Austin, Samara L. Kline, Dallas, Scott Partridge, Houston, Michael P. Lynn, Eric W. Pinker, John Jesse Kendrick, Robert E. Goodfriend, Dallas, for relator.

R. Laurance Macon, San Antonio, Jack Hightower, Austin, David J. Healey, Houston, Nina Cortell, Dallas, Lynne Liberato, Houston, Mike A. Hatchell, Tyler, Stephan B. Rodgers, Karen Kroesche Gulde, Melanie Goins Cowart, San Antonio, Ana E. Kadala, Stephen L. Lundwall, Houston, Sharon N. Freytag, Debra Janece McComas, Dallas, for respondent.

Justice ABBOTT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN and Justice GONZALES join.

The issue in this mandamus proceeding is whether the trial court abused its discretion by allowing DSC Communications[1] to take the apex depositions of two high-level Samsung executives. The court of appeals conditionally granted mandamus relief, concluding that DSC failed to prove that the executives had "unique or superior knowledge that is unavailable through less intrusive means." —— S.W.3d ——, 1998 WL 851123. We hold that DSC failed to present any evidence that arguably shows that the executives have unique or superior personal knowledge of discoverable information. Thus, the court of appeals did not err in conditionally granting the writ of mandamus because the trial court abused its discretion by overruling Samsung's[2] motion to quash the depositions. We therefore deny Alcatel's request for mandamus relief.

## I

DSC filed this suit alleging that Samsung engaged in a plan to steal a new DSC telecommunication technology known as "intelligent network" and "next generation switching" systems. DSC asserts that Samsung identified and lured a team of

---

1. In September 1998, DSC Communications Corporation merged with and changed its name to Alcatel USA, Inc. We refer to Relator throughout this opinion as DSC, as it was referenced in the trial court and the court of appeals.

2. The real parties in interest are James L. Bunch, Michael Bray, David Fox, Kevin Gallagher, Bhushan Gupta, Nancy Korman, James Olivier, Leo Putchinski, Martin Wu, Samsung Electronics Corp., Samsung Electronics Co., Ltd., and Samsung Telecommunications America, Inc. They are collectively referred to as "Samsung."

engineers away from DSC and then specifically assigned them to develop the same type of product they had developed at DSC. DSC claims that Samsung's actions were the direct result of a plan engineered at the highest level of Samsung's executive structure, and that highest-level Samsung executives were involved in the plan's execution at all stages.

DSC noticed the depositions of two high-level Samsung executives, Jin–Ku Kang and Kun–Hee Lee. Kang served as Chairman of defendant Samsung Electronics Co., Ltd. (SEC) during the earliest events giving rise to this case and is currently Chairman Emeritus of that corporation. Lee is currently Chairman and CEO of SEC and formerly served as the Chairman of the Samsung Chaebol[3] during the earliest events at issue in this case. DSC and Samsung agree, and therefore we assume, that the Kang and Lee depositions qualify as apex depositions.

Samsung moved to quash both depositions. At the first evidentiary hearing on the issue, the special discovery master assigned to the case deferred ruling until after the deposition of Mr. K.H. Kim, the former President and CEO of SEC at all times relevant to this matter.[4] After Kim's deposition, DSC renewed its request for the Kang and Lee depositions and moved to compel both. After holding another evidentiary hearing, the special discovery master denied Samsung's motion to quash and ordered that both depositions proceed. Samsung appealed the special discovery master's order to the trial court. The trial court reviewed the transcripts of these hearings and conducted a third hearing. The trial judge denied Samsung's appeal and affirmed the special discovery master's order. Samsung moved for reconsideration. After a fourth hearing on Samsung's motion to reconsider, the trial judge denied the motion.

Samsung filed a petition for writ of mandamus with the court of appeals. Basing its decision on *Crown Central Petroleum Corp. v. Garcia*, 904 S.W.2d 125 (Tex. 1995), the court of appeals held that DSC had failed to prove that it was entitled to take the apex depositions and conditionally granted mandamus relief. DSC filed a petition for writ of mandamus in this Court, arguing that the court of appeals abused its discretion by granting the writ because the trial court did not abuse its discretion.

**II**

Mandamus relief is available only to correct a "clear abuse of discretion" when there is no other adequate remedy at law. *See Walker v. Packer*, 827 S.W.2d 833, 839–44 (Tex.1992). When a party alleges that the court of appeals abused its discretion by granting mandamus relief, this Court focuses on whether the trial court's ruling was an abuse of discretion. *See In re Meador*, 968 S.W.2d 346, 350 (Tex.1998) (citing *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985)). We agree with the court of appeals that the trial court's ruling was an abuse of discretion and therefore we deny DSC's request for mandamus relief.

**III**

This Court first adopted the apex deposition guidelines in *Crown Central Petroleum Corp. v. Garcia*, 904 S.W.2d 125 (Tex. 1995). We held that the apex deposition guidelines apply "[w]hen a party seeks to depose a corporate president or other high level corporate official." *Id.* at 128. A party initiates the *Crown Central* guideline proceedings by moving for protection and filing the corporate official's affidavit denying any knowledge of relevant facts. The trial court evaluates the motion first by deciding if the party seeking the deposition has "arguably shown that the official

---

**3.** A chaebol is a Korean conglomerate in which subordinates are extremely deferential to their hierarchical superiors.

**4.** Mr. Kim currently serves as the CEO and Chairman of Samsung Americas.

has any unique or superior personal knowledge of discoverable information." *Id.* "If the party seeking the deposition cannot show that the official has any unique or superior personal knowledge of discoverable information, the trial court should" not allow the deposition to go forward without a showing, after a good faith effort to obtain the discovery through less intrusive means, "(1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate." *Id.*

■■■ While we agree with the court of appeals' conclusion that mandamus relief was appropriate, we disagree with that court's phrasing of the *Crown Central* guidelines. The court of appeals stated: "A party requesting an apex deposition must show that the corporate official to be deposed has an [sic] unique or superior personal knowledge that is unavailable through less intrusive means." —— S.W.3d ——, 1998 WL 851123. That phrasing of the guidelines improperly collapses the two discrete inquiries into a single test. Under *Crown Central*, if the party seeking the deposition has "arguably shown that the official has any unique or superior personal knowledge of discoverable information," the trial court should deny the motion for protection and the party seeking discovery should be entitled to take the apex depositions. *Crown Cent.*, 904 S.W.2d at 128. The party seeking the apex deposition is required to pursue less intrusive means of discovering the information only when that party cannot make the requisite showing concerning unique or superior knowledge. *See id.* We recognize that these guidelines could be read as requiring trial courts to undertake two hearings and issue two orders: First, a hearing on whether to grant a protective order and, if one is granted, then a second hearing, after less intrusive methods of discovery have been explored, to determine whether the protective order should be dissolved. We believe that such a mechanical application of the *Crown Central* guidelines is unnecessary when, as here, the parties have already undertaken extensive discovery and the court has sufficient information to consider both prongs of the guidelines.

In this case, when Samsung moved for the protective orders the parties had already engaged in significant discovery, including more than 300 hours of depositions. At this stage of discovery, nothing in *Crown Central* precluded the trial court from considering whether DSC had attempted to gain the information by less intrusive means and otherwise satisfied the second *Crown Central* test. The parties argued both *Crown Central* tests in the trial court, and both the discovery master and trial judge denied the requested protective orders without specifying the reasons. Accordingly, mandamus is not appropriate if the trial court's order can be sustained under either *Crown Central* test. We consider first whether DSC arguably showed that Lee or Kang have unique or superior personal knowledge of discoverable information.

### LEE

■■ The most comprehensive discussion of Kun–Hee Lee's knowledge as it relates to this lawsuit is found in a document submitted by DSC titled: "Kun–Hee Lee's Significance and Connection to This Lawsuit." In that document, DSC urges several reasons why Lee's deposition is necessary. First, under the heading "Kun–Hee Lee Sets Samsung's Course," DSC claims that (1) Lee is the leader of the Samsung Chaebol, (2) Lee sets the overall vision for the Samsung companies, and (3) Samsung's goal is to be one of the world's top five telecommunications companies by 2005. Second, under the heading "Kun–Hee Lee's Ties To The Lead Defendant, Samsung Electronics Co., Ltd.," DSC states that Lee (1) was the chief executive officer and president of SEC, (2) was a long-standing director of SEC, and (3) is

the largest single owner of Samsung and its subsidiaries.

Evidence tending to support these allegations does not satisfy the first *Crown Central* test; it merely demonstrates that Lee is a long-time company leader who sets the company vision with lofty goals. Virtually every company's CEO has similar characteristics. Allowing apex depositions merely because a high-level corporate official possesses apex-level knowledge would eviscerate the very guidelines established in *Crown Central.* Such evidence is too general to arguably show the official's knowledge is unique or superior.

■ In *AMR Corp. v. Enlow,* 926 S.W.2d 640 (Tex.App.—Fort Worth 1996, no writ), the Second Court of Appeals addressed a somewhat similar argument. In *AMR Corp.,* an American Airlines passenger became intoxicated on his flight and later had a traffic accident with the plaintiff. The plaintiff sued AMR Corp. and American Airlines under the Dramshop Act. The plaintiff sought the apex deposition of Robert Crandall, AMR's president, CEO, and chairman of the board, and American Airlines, Inc.'s CEO and chairman of the board, arguing that he "wish[ed] to depose Robert Crandall in order to determine where the authority lies within the organization for making those [alcohol service and flight attendant training] policy decisions so that Plaintiffs can understand how and why those policy decisions were made and what precisely the policies in place were." *Id.* at 643. The court of appeals held that "[t]his testimony amounts to nothing more than the simple, obvious recognition that the highest-ranking corporate officer of any corporation has the ultimate responsibility for all corporate decisions and falls far short of the [*Crown Central*] standard." *Id.* at

644. We agree with the *AMR Corp.* court of appeals. Testimony that a corporate executive possesses knowledge of company policies does not, by itself, satisfy the first *Crown Central* test because it does not show that the executive has unique or superior knowledge of discoverable information. *See In re El Paso Healthcare Sys.,* 969 S.W.2d 68, 74 (Tex.App.—El Paso 1998, no writ) ("A generalized claim that a corporate president has ultimate responsibility for all corporate decisions or has knowledge of corporate policy is insufficient to establish that the corporate president has unique or superior personal knowledge of discoverable information."); *see also AMR Corp.,* 926 S.W.2d at 644.

Under the heading "The Samsung Project At Issue In This Case Smacks Of Chairman–Level Importance," DSC claims that (1) the "[t]echnology at issue in this case involved huge investments and expected revenue," (2) "SEC's commitment to technology in this case is significant to execution" of its plan to be in the top five companies in its industry, (3) "[t]he significance of the project is illustrated by the claims made in this case,"[5] and (4) "Kun–Hee Lee has been involved with Samsung's telecommunications business." Proof of the importance of the project to Samsung, combined with the allegation that the issue in this case "smacks of chairman-level importance," at most tends to show that the chairman-level official whose deposition is sought may possess discoverable information. It does not, however, arguably show that the official's knowledge is unique or superior. Consequently, the first prong of the *Crown Central* guidelines has not been satisfied with regard to Lee.

### KANG

■ J.K. Kang served as Chairman of defendant SEC during the earliest events that gave rise to this case and is currently

---

5. DSC states that (1) "SEC claims $300 million in damages caused simply by a *delay* in this project," (2) "DSC's damages are $1.3 billion, including present value of $922 million for Samsung's ill-gotten profits," and (3)

"DSC's claims for punitive damages arise, in part, from Samsung's corporate culture and strategic directives, which have been set by the highest level of Samsung management, including Kun–Hee Lee."

Chairman Emeritus of that corporation. DSC contends that Kang's unique or superior personal knowledge is arguably shown by the deposition testimony of Dr. Joo Hyung Lee, an SEC manager who personally oversaw the establishment of Samsung's Dallas laboratory. Contrary to DSC's contention, Joo Hyung Lee's deposition conveys that Kang may have been made aware of information contained in reports prepared by others, but still does not show why Kang's knowledge may be unique or superior.

In his deposition, Joo Hyung Lee testified that he prepared a status report of the next-generation switching system and presented it to, among others, Song, the Samsung executive in charge of telecommunications, and Kang. Joo Hyung Lee characterized the report as an overview that did not last very long—it was "kind of a simple thing." He further testified that, other than that single presentation, he had no other communication with Kang concerning the next-generation switching system. Further probing by DSC during Joo Hyung Lee's deposition indicated that none of the project's details were conveyed to Kang by Joo Hyung Lee; instead, it was Joo Hyung Lee and Song who were involved in the details:

Q. And I believe section 1.3 [of the document entitled "The Current Status of the Next–Generation Switch System"] provides the time line for the next-generation system as you [Joo Hyung Lee] contemplated it at that time?

A. Yes, that's right.

Q. And if you turn to the next page, I believe this page addresses the—what is called a progress report, and Section 2.1 addresses employment status; is that right?

A. Yes, that's correct.

Q. And the—the box is indicating the number of people that you had interviewed as well as the response to your advertisements, things like that; is that correct?

A. That's correct.

Q. And at that time, you were indicating to Chairman Kang that you had 15 total people that you were engaged in employment contract negotiations with?

A. Well, I'm thinking, you know, again, that this and the subsequent stuff, you know, I don't think we necessarily made a report on that to the chairman.

Q. Are you saying that the items in part two, you're uncertain whether they were presented to the chairman?

A. I'm thinking that we probably did not specifically make a report on this to him. I mean, this is, you know, all too detailed a level for it to be, you know, reported to the chairman.

. . . .

Q. Did you discuss this with Mr. Song?

A. Yeah, because that's a matter of the progress, just in a simple fashion.

Q. With respect to item three of the document, which I believe concerns the status report on the facilities or the buildings that you were considering, did you discuss that with Chairman Kang?

A. I don't recall that I did.

Q. Did you discuss it with Mr. Song?

A. Yes. We just kind of briefly told him about how there was something like this.

Q. And would you turn to the fourth matter in the document on the last page.

A. Yes.

Q. Which I believe is addressing proposed matters; is that correct?

A. Well, proposed, well, basically I, you know, kind of presented my opinions during this time of the—the report.

Q. And that was my question. Were these matters presented to Chairman Kang during the presentation?

A. No. I don't think there—that would have been necessary vis-a-vis the chairman.

Q. Would these have been discussed with Mr. Song?

A. Yes.

Additionally, DSC claims that an index of computer files produced by Samsung contains numerous listings of computer files identified as reports to J.K. Kang on Samsung's next generation switching system. One of these reports that Kang apparently received a copy of was titled "Action Plans for the Development of the Next Generation Telecommunication System."

■ This evidence arguably shows that Kang may have discoverable information. But the first *Crown Central* guideline requires more; it requires that the person to be deposed arguably have *"unique or superior* personal knowledge of discoverable information."  This requirement is not satisfied by merely showing that a high-level executive has some knowledge of discoverable information.  If "some knowledge" were enough, the apex deposition guidelines would be meaningless; they would be virtually indistinguishable from the scope of general discovery.  Although *Crown Central* did not elaborate on what character of knowledge makes it unique or superior, there must be some showing beyond mere relevance, such as evidence that a high-level executive is the only person with personal knowledge of the information sought or that the executive arguably possesses relevant knowledge greater in quality or quantity than other available sources.

At most, DSC's evidence establishes that Kang received information related to the underlying facts of this case.  A recipient's knowledge of the contents of a report is not unique or generally superior to the author's, of course.  The record shows that Joo–Hyung Lee's and Song's knowledge of the reports to Kang is comparable, if not superior, to the knowledge possessed by Kang. Although both Joo–Hyung Lee and Song were deposed by DSC, the record does not show that Kang possessed information not possessed by Lee and Song and does not show that Kang had relevant knowledge that was greater in quantity or quality than Lee or Song. Combined with other factors, receipt of such a report could arguably support that Kang had unique or superior knowledge.  But evidence that an apex official received information requires something more to establish that the apex has unique or superior knowledge of discoverable information.

## IV

DSC seeks to distinguish business-related cases like this from tort-related cases like *Crown Central* and *AMR Corp.* DSC contends that the trial court, in allowing the depositions to proceed, considered that "this litigation involves two giant international multinational corporations suing each other over trade secrets and corporate direction, policy and defamation." DSC argues that, "[i]n contrast to cases like ... *Crown Central,* this is the very kind of lawsuit in which high-level executives would be *expected* to participate." (Emphasis in original).  The special discovery master apparently agreed with this reasoning by stating:

[T]his is not the same situation as in *Crown Central* or the *Wal–Mart* case, the original apex deposition case.  Mr. Lee appears to be the one person at the very top of the chain at Samsung, and *it may very well be that he does not know anything that's relevant to this case,* and that can be determined very quickly. But I think that *DSC ought to have an opportunity to test that.*

(Emphasis added).

■ Even if a lawsuit concerns a business dispute rather than a tort claim, and regardless of whether high-level executives would be *expected* to participate in a decision relevant to the dispute, the *Crown*

*Central* prerequisites must still be met. Business disputes provide no greater license than any other kind of suit to explore by apex deposition whether a high-level executive knows anything relevant to the case. It may well be true that many tort claims arise without the knowledge or involvement of a high-level officer. Conversely, it may also be true that many business disputes directly involve the decisions or actions of a high-level officer. Regardless of the truth, *vel non,* of these suppositions, the fact remains that the *Crown Central* guidelines must be applied.

## V

Because DSC failed to arguably show that either Kang or Lee possesses unique or superior knowledge of discoverable information, the trial court's order cannot be supported under the first *Crown Central* test. Nevertheless, DSC argues that it has pursued less intrusive means and therefore is entitled to the depositions under *Crown Central*'s second guideline:

> If the party seeking the deposition cannot show that the official has any unique or superior personal knowledge of discoverable information, the trial court should grant the motion for protective order and first require the party seeking the deposition to attempt to obtain the discovery through less intrusive methods.... After making a good faith effort to obtain the discovery through less intrusive methods, the party seeking the deposition may attempt to show (1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient or inadequate. If the party seeking the deposition makes this showing, the trial court should modify or vacate the protective order as appropriate.... If the party seeking the deposition fails to make this showing, the trial court

should leave the protective order in place.

*Crown Cent.,* 904 S.W.2d at 128.

From the record before us, DSC has not shown that it attempted to obtain the information it sought from Kang through less intrusive methods. DSC based its contention that Kang has unique or superior knowledge largely on his presence at a written and oral presentation concerning the next generation switching system. But, DSC was allowed to depose Joo–Hyung Lee, who presented the report to Kang and Song. Also, DSC deposed Song, the Samsung executive in charge of telecommunications, who also attended the presentation. Yet, DSC has failed to identify any relevant information that it seeks from Kang that it attempted and failed to obtain from either Joo–Hyung Lee or Song.

In addition, DSC failed to establish that it attempted to obtain the information that it sought from Lee through less intrusive methods. DSC argued that Lee has unique and superior knowledge regarding Samsung's policies. But the special master allowed DSC to depose Kim, the president and CEO of SEC during the relevant time. Yet, DSC failed to ask Kim any questions about Samsung's "vision" for telecommunications or any of the other issues DSC now contends justify an apex deposition of Lee. DSC also did not issue interrogatories, requests for admissions, or any other forms of discovery to Samsung regarding its corporate policies. The record simply does not show that the information sought from Lee was sought by less intrusive means or that the information sought was unobtainable from other sources.

Absent a showing that an executive arguably has unique or superior personal knowledge, a court has no discretion to allow an apex deposition unless the party seeking the deposition establishes that it has attempted to obtain the information through less intrusive methods. The special master provided DSC with the oppor-

tunity to depose other Samsung executives who at least arguably possessed the information DSC seeks. Yet, DSC either failed to take advantage of that opportunity or failed to preserve its attempts in the record. Thus, the trial court abused its discretion in overruling Samsung's motion to quash the depositions of Kang and Lee.

\* \* \* \* \*

We agree with the court of appeals' conclusion that the trial court abused its discretion when it refused to quash the depositions of Kang and Lee because it failed to properly apply the guidelines set forth in *Crown Central v. Garcia.* Accordingly, we deny the mandamus relief requested by DSC.

Justice ENOCH filed a dissenting opinion, in which Justice BAKER and Justice O'NEILL join.

Justice HANKINSON did not participate in the decision.

Justice ENOCH, joined by Justice BAKER and Justice O'NEILL.

This Court has held that the proper place to amend or promulgate a rule is through rulemaking, not judicial fiat.[1] Yet today, from mere guidelines intended to aid a trial court's decision to allow or prevent apex depositions in the context of discovery harassment, the Court effectively forges an apex deposition rule—one, significantly, not found in our recently promulgated discovery rules. This new rule erects an improperly high barrier, imposing a special protection for corporate officials.

The apex guidelines arose from an evaluation of the existing Rules of Civil Proce-

dure, which have long articulated a deponent's right to protection "from undue burden, unnecessary expense, harassment, [or] annoyance...."[2] The progenitor of Texas cases analyzing the propriety of apex depositions is *Wal–Mart Stores, Inc. v. Street.*[3] In that case, this Court examined a business invitee's assertion in a slip-and-fall case that he should be allowed to depose the chair of Wal–Mart's Board of Directors, Sam Walton. We held that the trial judge abused his discretion by ordering the deposition to be taken at a location other than Walton's residence or place of business.[4] Our decision in *Street* recognized the potential for harassment that high-level corporate officials face when a corporation is routinely subjected to litigation, and when the official's connection to the case is as tenuous as Walton's connection to a slip-and-fall case in one of hundreds of Wal–Mart stores.

Despite the Court's concerns signaled in *Street,* litigants continued to seek the depositions of highest ranking executives of large corporations in what appeared to be nothing more than an effort to harass or pressure settlement by needlessly increasing the costs of litigation.[5] Deciding that it was appropriate to alert courts to such undue discovery burden and harassment, we established parameters to guide a trial court's discretion.[6] While I strongly support the protection from harassment that our apex deposition guidelines provide, I do not countenance a *de facto* rule, unavailable to any other potential deponent, that extends a privilege to corporate officials to avoid depositions by virtue of their position.

Consistent with this Court's holding in *Crown Central,*[7] I would hold that when

---

1. *See State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992); *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992).

2. Tex.R. Civ. P. 192.6(b).

3. 754 S.W.2d 153 (Tex.1988).

4. *See id.* at 155.

5. *See Monsanto Co. v. May,* 889 S.W.2d 274 (Tex.1994) (opinion on denial of leave to file petition for writ of mandamus).

6. *See Crown Cent. Petroleum Corp. v. Garcia,* 904 S.W.2d 125, 128 (Tex.1995).

there is evidence that *arguably shows* that a high-level corporate official has any unique or superior personal knowledge of discoverable information, a trial court does not abuse its discretion by allowing an apex deposition. But when the evidence suggests only that a high-level official's deposition is being sought because the official has ultimate decisionmaking authority, "this amounts to nothing more than the simple, obvious recognition that the highest-ranking corporate officer of any corporation has ultimate responsibility for all corporate decisions," [8] and falls far short of supporting a trial court's discretion to allow the deposition. Consequently, I disagree with the court of appeals' conclusion in this case protecting Kang from being deposed, but agree that Lee cannot be deposed. I would therefore conditionally grant mandamus in part against the court of appeals, and allow the Kang deposition to proceed.

To determine whether the court of appeals improperly granted mandamus relief, this Court focuses on whether the trial court's ruling was an abuse of discretion.[9] A trial court is vested with broad discretion in the area of discovery.[10] Indeed, the reviewing court may not substitute its judgment for the trial court's.[11] *Crown Central*'s guidelines inform a trial court's discretion to allow or prevent an apex deposition. Pertinent to this case, the trial court's discretion was to be guided by whether DSC *arguably* showed that Kang or Lee had *any* unique *or* superior personal knowledge of discoverable information, and, generally, whether the depositions were sought to harass.[12] The Court's deci-

sion today raises a barrier to many otherwise legitimate apex depositions by divesting the trial court of its discretion, and by substituting this Court's judgment for the trial court's.

### LEE

In *AMR Corp. v. Enlow*,[13] the plaintiffs argued that they could depose AMR CEO Robert Crandall in their dramshop negligence case because Crandall had ultimate authority on all of AMR's policies. The court of appeals prevented the deposition, concluding that ultimate policy authority is insufficient evidence and that parties must articulate facts implicating the apex official's personal knowledge.[14] The allegations and mandamus evidence in this case point to Lee in the same way the *AMR* plaintiffs pointed to Crandall. DSC's record evidence reflects such nebulous items as the fact that Lee sets the overall vision for Samsung, is a principal Samsung shareholder, and believes Samsung should actively pursue status as a top-five global telecommunications company. Allegations that a CEO should be deposed because that is where the buck stops are not evidence arguably showing unique or superior personal knowledge of discoverable information. As such, I believe the Court correctly adopts the *AMR* standard with regard to Lee. But while I agree with the Court's result on Lee, my decision would hinge only on the *AMR* rationale. The Fort Worth Court of Appeals described and answered the problem succinctly. I would not go beyond that rationale in analyzing whether the trial court abused its discretion by allowing Lee's deposition.

---

7. *See id.*

8. *AMR Corp. v. Enlow*, 926 S.W.2d 640, 644 (Tex.App.—Fort Worth 1996, orig. proceeding).

9. *See In re Meador*, 968 S.W.2d 346, 350 (Tex.1998).

10. *See Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex.1985).

11. *See Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex.1990).

12. *See Crown Central*, 904 S.W.2d at 128 (emphasis added).

13. 926 S.W.2d 640 (Tex.App.—Fort Worth 1996, orig. proceeding).

14. *See id.* at 644.

*KANG*

The mandamus record reflects that the special discovery master, Judge Andrews, sat through more than thirty hearings on more than sixty discovery motions. The record also reflects that Judge Andrews understood that this was not a case in which the facts driving the litigation are extremely remote from the CEO and trickle up the corporate structure. Here, corporate policy and directives may have pushed the events driving this litigation down the corporate hierarchy. Inevitably, the policies driving corporate action and personal knowledge of actions taken in pursuit of such policies intersect. One federal court has held that at this intersection, "when the motives behind corporate action are at issue, an opposing party usually has to depose those officers and employees who in fact approved and administered the particular action." [15] While it is not this Court's role to say whether Kang arguably was at the intersection of Samsung's corporate policy and the events driving this litigation, given the evidence before it, the trial court did not abuse its discretion by doing so.

Only after an exhaustive review of the evidence DSC presented did the trial court conclude that Kang arguably had unique or superior personal knowledge of discoverable information. DSC offered evidence that Kang was directly involved in Samsung's next generation switching system project and had been specifically informed of Samsung's efforts to obtain DSC technology. There was also evidence that Kang received a written and oral presentation in 1996 about the status of Samsung's next generation switching system project in the United States, and that numerous reports were provided to Kang on the same project around the time of the events giving rise to this suit. One of the reports apparently contained an organizational chart for Samsung's telecommunication project that contained the names of DSC employees—who were still with DSC at the time. When asked why he made the presentation to Kang, a lower-level Samsung official responded "because [Kang] had a lot of interest in the information telecommunications side of the business." While this evidence shows Kang's personal knowledge of relevant information, the question *Crown Central* requires the trial court to consider before allowing the deposition is whether DSC arguably showed that the knowledge was unique or superior.

Substituting its judgment for the trial court's, the Court concludes that Kang could not be deposed because DSC did not arguably show that Kang's knowledge of discoverable information was unique or superior. As evidence that Kang did not reach this level of knowledge, the Court offers Dr. J.H. Lee's deposition testimony that: (1) the report was a simple thing that did not last long; (2) outside of the report, Dr. Lee had no other communication on the next-generation network switch system with Kang; and (3) Dr. Lee conveyed no project details to Kang.[16] In support of its conclusion, the Court announces the new apex deposition rule that a party must make a showing beyond *mere* relevance with evidence "such as . . . that " (1) a high-level executive is the only person with personal knowledge of the information sought or (2) the executive arguably possesses relevant knowledge greater in quality or quantity than other available sources." [17] Relying on this new rule, the Court surmises that Kang cannot be deposed because, at best, Dr. Lee's deposition "conveys that Kang may have been made aware of information contained in reports prepared by others, but still does not show why Kang's knowledge may be unique or superior." [18] This new rule and its rationale are problematic.

15. *Travelers Rental Co. v. Ford Motor Co.*, 116 F.R.D. 140, 142 (D.Mass.1987).

16. 11 S.W.3d at 178.

17. *Id.* at 179.

18. *Id.* at 178.

The Court's conclusion is problematic because it would require a litigant seeking to depose a CEO regarding a board-level decision, about which all present at the board meeting have the same information, to depose a lower-level board member and not the CEO. Why should a litigant be forced to depose the least qualified witness when it could depose the most qualified if they have the same information? While the CEO and a lower-level official may have the same information, they have different levels of knowledge. As one federal court has concluded, an apex official's knowledge may be deemed unique and the deposition allowed, even if other corporate officials possess similar knowledge.[19]

Moreover, the Court's opinion treats "knowledge" as though it were only the bare facts communicated to Kang and nothing more. But knowledge is more than mere information. The Court ignores the role that Kang's, or any apex official's, position within the corporation plays on the information received. When the policies driving corporate action and personal knowledge of actions taken in pursuit of such policies intersect, a new level of knowledge arises. When the motives behind corporate action are at issue, *arguably* the knowledge created at that intersection is unique to the corporate officer. And certainly that level of knowledge is "greater in quality" than the level possessed by the individual who communicated only the bare facts.

This does not mean that an apex official who merely receives information will automatically be deposed. Trial courts must continue to employ the Rules of Civil Procedure to protect all potential deponents from "undue burden, unnecessary expense, harassment, [or] annoyance...."[20] Moreover, as the Fort Worth Court of Appeals correctly recognized, for corporate officials, bald allegations of final policymaking

authority will not constitute sufficient evidence to justify an apex deposition. Likewise, mere allegations that the apex official both forms policy and has personal knowledge of facts relevant to the litigation do not arguably show unique or superior knowledge. Rather, there should be some evidence that the confluence of the official's policy-forming role and personal knowledge of activities related to such policies arguably creates unique or superior knowledge of discoverable information.

The Court's reliance on the amount of Kang's knowledge that Dr. Lee's deposition testimony "conveys" is also troublesome. Benefitted by numerous hearings and direct contact with the litigants and the evidence, the special master and the trial judge had no need to rely on the mere implications of the evidence. Indeed, trial courts have the best vantage point from which to determine whether an apex official's receipt or use of information communicated by lower-level officials arguably shows unique or superior knowledge.

To make this determination, trial courts should consider the context of the allegations the discovering party raises, the type of information sought from the official, any evidence of the official's role in the specific act or transaction underlying the suit, and the official's role within the corporation relative to the corporation's size. In addition, if the party merely seeks factual information an apex official receives, the trial court may limit such discovery if the information "is obtainable from some other source that is more convenient, less burdensome, or less expensive."[21] But if the discovering party presents some evidence showing that the receipt of information and the official's corporate role arguably combine to form unique or superior knowledge, the trial court does not abuse its discretion to allow the deposition. For this Court to decide that the trial court

19. *See Speadmark, Inc. v. Federated Dep't Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y. 1997).

20. Tex.R. Civ. P. 192.6(b)

21. Tex.R. Civ. P. 192.4(a).

abused its discretion here, invades the trial court's discretion in the type of judgment call where it is uniquely implicated.

As *Crown Central* counsels, trial courts should carefully balance litigants' need for information against the potential for abuse apex depositions pose. And while the discovering party may not initially be entitled to the deposition if they fail to make the requisite showing, the matter is not foreclosed. *Crown Central* counsels that after a party has failed to offer some evidence that arguably shows the official's unique or superior knowledge, the party may still pursue a good faith effort to discover the information through less-intrusive methods, and then attempt to take the apex deposition.[22]

A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law."[23] Given the evidence before it, and the special master's intimate familiarity with the case, I cannot say that the trial judge's decision to permit Kang's deposition was arbitrary and unreasonable. DSC presented evidence that supports the trial court's decision because it arguably shows that Kang had unique or superior discoverable knowledge. And with respect to resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court.[24] Finally, Judge Andrews was not unmindful of the possibility that the depositions were sought to harass. He therefore specifically limited the depositions to matters raised in the parties' claims and counterclaims. Thus, the trial court did not abuse its discretion when it refused to quash the deposition of Kang. Consequently, I would conditionally grant mandamus in part against the court of appeals, allow-

ing Kang's deposition to proceed, but preventing Lee's.

---

**22.** See *Crown Central*, 904 S.W.2d at 128.

**23.** *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985).

**24.** See *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41–42 (Tex.1989).