Petition
for Writ of Mandamus Conditionally Granted and Opinion filed February 4, 2010.

In
The

Fourteenth
Court of Appeals



NO. 14-09-00952-CV



 

In Re Continental Airlines, Inc.,
Relator



 



ORIGINAL
PROCEEDING



WRIT OF MANDAMUS



OPINION

November 12, 2009, relator, Continental Airlines,
Inc., filed a petition for writ of mandamus in this Court.  See Tex.
Gov’t Code Ann. §22.221 (Vernon 2004); see also Tex. R. App. P. 52.  In
the petition, relator asks this Court to compel the Honorable Mike Miller,
presiding judge of the 11th District Court of Harris County, to set aside his
October 26, 2009 order compelling the deposition of Larry Kellner, Chief
Executive Officer and Chairman of the Board of Directors of Continental.  We
conditionally grant the petition.  

Background

            On
December 20, 2008, Continental Flight 1404 was involved in an accident when it
departed from the runway during takeoff from the Denver International Airport. 
There were no fatalities, but 37 passengers and crew were transported to the hospital. 


            Larry
Kellner, Continental’s Chief Executive Officer and Chairman of the Board of
Directors, gave a statement and answered questions at a press conference
following the accident.  On December 22, 2008, Kellner sent a letter to the
passengers expressing his concern for the accident.  The plaintiffs brought
suit against Continental for negligence.[1]


            On
October 6, 2009, the plaintiffs noticed the deposition of Kellner for November
5, 2009.  On October 9, 2009, Continental filed a motion to quash the
deposition, arguing that Kellner has no unique or superior knowledge of
discoverable information and the plaintiffs have not attempted to obtain
discovery through less intrusive methods.  See Crown Cent. Petroleum Corp.
v. Garcia, 904 S.W.2d 125 (Tex. 1995) (orig. proceeding).  Continental also
objected to the time and place set forth in the notice because Kellner had
prior commitments requiring him to be out of town on that date.

            On
October 9, 2009, the plaintiffs moved to compel Kellner’s deposition, arguing
that he has unique or superior knowledge of discoverable information as shown
by the following: (1) Kellner immediately briefed media members on details of
the crash; (2) Kellner stated, on numerous occasions, he would learn the cause
of the crash to prevent future crashes; (3) Kellner sent personal letters to
Flight 1404 passengers after the crash; (4) Kellner interviewed the deadheading
pilots aboard Flight 1404 and personally awarded commendation plaques to crew
and flight members; and (5) Kellner, who serves on the Board of Directors for
Air Transport Association of America (“ATA”), an airline industry organization
dedicated to ensuring the safety of airline passengers, has superior knowledge
as to Continental’s implementation of ATA’s policies.  On October 19, 2009,
Continental filed a motion for protective order and response to the motion to
compel, with Kellner’s affidavit in which he testified that he has no unique or
superior knowledge. 

            On
October 26, 2009, the trial court held a hearing on the plaintiff’s motion to
compel and Continental’s motion for protection.  The trial court granted the
motion to compel Kellner’s deposition, and orally stated that the deposition
was limited to two hours and to actions and statements by Kellner relating to
the crash of Flight 1404.  On October 26, 2009, the trial court signed the
order granting the motion to compel, denying the motion for protective order,
and granting the motion to quash.  However, the trial court did not mention the
above limitation on the deposition in its order.[2]


Mandamus Standard of Review

            To
be entitled to extraordinary relief in a writ of mandamus, the relator must
show the trial court clearly abused its discretion and there is no adequate
remedy by appeal.  In re Team Rocket, L.P., 256 S.W.3d 257, 259 (Tex.
2008) (orig. proceeding).  A trial court abuses its discretion if it reaches a
decision so arbitrary and unreasonable as to constitute a clear and prejudicial
error of law, or if it clearly fails to correctly analyze or apply the law.  In
re Cerebus Capital Mgmt., L.P., 164 S.W.3d 379, 382 (Tex. 2005) (orig.
proceeding) (per curiam); Walker v .Packer, 827 S.W.2d 833, 839 (Tex.
1992) (orig. proceeding).  Mandamus is an appropriate remedy when a trial court
allows an apex deposition to go forward in violation of the standard governing
such discovery.  E.g., In re Prods. N. Am., Inc., No. 01-06-00613-CV,
2006 WL 2192546, at *2–3 (Tex. App.—Houston [1st Dist.] Aug. 4, 2006, orig.
proceeding) (mem. op.).  

Crown Central Guidelines

            The
standard governing apex depositions originates in Crown Central Petroleum
Corporation, 904 S.W.2d at 128.  The Crown Central guidelines apply
“[w]hen a party seeks to depose a corporate president or other high level
corporate official and that official (or corporation) files a motion for
protective order to prohibit the deposition accompanied by the official’s
affidavit denying any knowledge of facts . . . .”  Id.  A party
initiates the Crown Central guidelines by moving for protection and
filing the corporate official’s affidavit denying any knowledge of relevant
facts.  In re Alcatel USA, Inc., 11 S.W.3d 173, 175 (Tex. 2000) (orig.
proceeding).  

            “The
trial court evaluates the motion first by deciding if the party seeking the
deposition has ‘arguably shown that the official has any unique or superior
knowledge of discoverable information.’”  Id. at 175–76 (quoting Crown
Cent. Petroleum Corp., 904 S.W.3d at 128).  “‘If the party seeking the
deposition cannot show that the official has any unique or superior knowledge
of discoverable information, the trial court should’ not allow the deposition
to go forward without a showing, after a good faith effort to obtain the
discovery through less intrusive means, ‘(1) that there is a reasonable
indication that the official’s deposition is calculated to lead to the
discovery of admissible evidence, and (2) that the less intrusive methods of
discovery are unsatisfactory, insufficient or inadequate.’”  Id. at 176
(quoting Crown Cent. Petroleum Corp., 904 S.W.3d at 128).  

            In
In re Alcatel USA, the Texas Supreme Court recognized that these
guidelines could be read as requiring trial courts to undertake two hearings
and issue two orders.  Id.  “We recognize that these guidelines could be
read as requiring trial courts to undertake two hearings and issue two orders: 
First, a hearing on whether to grant a protective order and, if one is granted,
then a second hearing, after less intrusive methods of discovery have been
explored, to determine whether the protective order should be dissolved.”  Id. 
Therefore, a “mechanical” application of the Crown Central guidelines is
not necessary when the parties have already undertaken extensive discovery and
the court has sufficient information to consider both prongs of the guidelines. 
Id.  

Analysis

Unique or
Superior Knowledge

            Continental
asserts that it met its burden for invoking the apex procedure set forth in Crown
Central.  In his affidavit, Kellner testified, in relevant part:

            . . . While I have knowledge of some facts
relating to the accident by reason of my position as CEO, I do not possess any
unique or superior personal knowledge beyond that of other senior management
personnel at Continental who are involved in the day-to-day management of the
airline’s operations generally and who were involved in the response activities
as a result of the accident specifically. 

            The
plaintiffs claim they seek to depose Kellner because he has first-hand
knowledge of relevant facts such as information about the events leading up to
and during the crash of Flight 1404, and how Continental planned to handle
passengers’ claims and prevent similar crashes in the future.  Continental argues
that it is not sufficient to show that Kellner has unique or superior knowledge
of some facts or matters concerning the subject matter, but of facts or matters
relevant to the contested fact issues of the litigation, i.e., whether
Continental’s negligence, if any, proximately caused the accident, and what
injuries and damages, if any, each plaintiff sustained.  

            The
plaintiffs contend that Kellner began his hands-on involvement when he held a
press conference just hours after the crash at which he stated that Continental
“will do whatever we can to learn the cause of this accident so that we can
prevent a recurrence at Continental or at any other airline.”  

            At
the press conference, Kellner generally stated that Continental “will do
everything we can for the passengers, their families, and our coworkers.” 
Kellner further recited the basic facts of the accident, that a number of
injuries had been reported, and passengers and crew had been transported to
area hospitals.  Kellner also stated that Continental was mobilizing its
“Accident Go Team,” which is comprised of Continental experts—people from
safety, air traffic control, engineering, maintenance, and flight operations—to
assist in the investigation.  Kellner concluded his statement by saying: “We
will continue to do everything we can for the passengers, crew, and their
families.  We will also do whatever we can to learn the cause of this accident
so that we can prevent a reoccurrence at Continental . . . .”

            In
response to questions at the press conference, Kellner stated: 

·       
“We’ll work with each of the
passengers individually to do what’s best for them.  Obviously this has been a
very difficult evening for them, even if they weren’t injured and didn’t go to
the hospital, and so we’ll address that on a passenger-by-passenger basis.”  

·       
“I know at this time, I’ve given
you all the facts I know.  As I mentioned, we’ll have our Go Team going up
there later this morning.  A few hours, they’ll leave here.  We’ll work with
the NTSB and there’ll be a full and thorough investigation.”

·       
“Again, all we know is that it was
taking off[.]  It was about 6:00 p.m.  Mountain Standard Time and that it
veered off the runway, slides were deployed, but we’re not really . . .  Again,
we’ll do a full investigation.  NTSB will do a full—will lead a full
investigation.  We’ll assist with that; and as those facts come out, we’ll give
them to you.”

·       
“I don’t want to go into too much
of it and what was in the weather there.  There’s nothing specific that’s come
up on the weather as far as snow or those type [sic] of items.  But I really
want to let the investigation more [sic] forward to figure out what happened as
far as the cause of the accident.  But there’s nothing specific I’d comment on
the weather at this moment.”  

            In
his affidavit, Kellner stated that the information he provided at the press
conference was not unique or superior individual knowledge because it was given
to him by other individuals at Continental.  Moreover, Continental argues that
none of Kellner’s public statements made after the accident have anything to do
with whether the flight crew acted negligently, or whether the passengers
actually sustained any injuries in the accident.  

            The
plaintiffs further assert that the December 22, 2008 letter sent after the
crash to each passenger reiterates Kellner’s involvement.  The December 22,
2008 letter states:

            Let me begin by expressing my deep personal
concern for the distressing experience you had as a passenger aboard our flight
1404 on December 20, 2008.  We regret that you had to go through this
experience and are working diligently with the National Transportation Safety
Board to determine the cause of the accident and to help make sure that
something like this never again occurs at Continental or any other airline.

            I would like to personally thank you for your
quick response during the evacuation of the aircraft and apologize for what you
had to go through.  The safety of our passengers and crew is our highest
priority.

            On behalf of my co-workers at Continental,
please allow me to express once again my deepest regret for your experience on
board flight 1404.

            The
plaintiffs contend that the information Kellner states he intends to uncover
while working with the NTSB is discoverable because it pertains directly to the
basis of their claims.  In this affidavit, however, Kellner stated that he has
no unique or personal knowledge of the investigation into the cause of the
accident.  Kellner explained that the NTSB, not Continental, is conducting the
official investigation into the cause of the accident, and Continental
continues to cooperate with the NTSB investigation.  

            Federal
law provides that the NTSB, not Continental, is to conduct the investigation of
the accident, and will determine the cause or probable cause of the accident.[3] 
Continental, as a party designated by the NTSB to participate in the
investigation, is prohibited from conducting its own investigation into the
cause of the accident during the pendency of the NTSB investigation.[4] 
Here, Continental is not conducting the investigation to determine the probable
cause of the accident.  

            Moreover,
Kellner stated that Toby Carroll is Continental’s representative relative to
the NTSB investigation.  The plaintiffs have not stated whether they have taken
Carroll’s deposition or, if so, that they were unable to elicit the information
they are seeking.  Therefore, Kellner has shown that he does not have unique or
superior knowledge relative to the cause of the accident. 

            The
plaintiffs further argue that the information and facts Kellner has learned
about the cause of the accident in executive briefs provide him with unique and
superior knowledge.  They assert that the deposition testimony of Continental’s
chief pilot shows that based on Continental’s standard operating procedure, Kellner
received executive briefs about “what’s going on and what’s happening in this
case.”  Andrew Jost testified:

            Q.  Do you know anybody that’s talked to Mr.
Kellner personally about this crash?

            A.  No.

            Q.  Not that it hasn’t happened; you just don’t
know about it?

            A. Correct.

            Q.  Would Mr. Kellner—based on the policies and
procedures that you know that are in place internally at Continental Airlines,
Mr. Kellner would have a pretty good idea of what’s going on and what’s
happened in this case, don’t you think?

*        *        *

            A.  Well, I’m sure Mr. Kellner has received a
executive brief or—or some briefing in some fashion.

            Q.  (BY MR. GIBSON) It is standard operating
procedure of Continental for—for Mr. Kellner or the CEO of—of the airline to
receive an—executive summary—

*        *        *

            Q.  (BY MR. GIBSON)—when something like this
happens?

            A.  I—I’m sure it is.

            Q.  And what does an executive summary consist
of?

*        *        *

            A.  Well, in my opinion, it would be just
the—the facts as we know them and the circumstances surrounding the—the
incident, accident, whatever the situation was.

            Q.  (BY MR. GIBSON) Do you know who’s
responsible for preparing that brief?

            A.  No.

            Q.  Have you reviewed the executive brief in
this case that was given to Mr. Kellner?

*        *        *

            A.  I—I have—I can’t even say that it exits. 
I’m just thinking it does, so. . . .

            In
his affidavit, Kellner states, in the days immediately following the accident,
that he received briefing about the accident, “primarily related to the status
and effectiveness of the passenger and family assistance efforts in Denver and
Houston, the general health and well-being of the passengers and crew, and
Continental’s media response to the accident.”[5] 
Therefore, he did not acquire any unique or superior knowledge about the cause
of the accident as a result of post-accident briefings.  A review of Jost’s testimony
shows that he has never reviewed an executive brief and that he does not know
what information an executive brief contains.  Therefore, Jost’s testimony does
not contradict Kellner’s statement that no unique or superior personal
knowledge has been acquired through these briefings.  

            The
plaintiffs further claim that Kellner continued to take an active role in
learning the details of what caused the accident when he interviewed the
deadheading pilots on Flight 1404, Richard Lowe and Richard Green.[6]  According
to the plaintiffs, when Lowe and Green arrived back in Houston, Kellner met
with them to discuss what occurred before, during, and after the crash. 
Kellner also awarded recognition plaques to the crew and pilot members, which
evidences Kellner’s “hands on” involvement.  

            Todd
Green testified regarding the identity of those who attended the meeting, but
did not recite what was said at the meeting: 

            A.  And there was a—a brief—I should say a
short debrief that was agreed upon there at the airport.  

*        *        *

            Q.  Let’s talk about that meeting when you got
back to Houston.  When was that?

*        *        *

            Q.  And Mr. Kelleher [sic]?

            A.  He was there briefly.  He was there—met the
flight, and he did come in and—and talk to us once or twice.  He talked to
everyone on the airplane initially.

            But I did meet with him.  There may have been
some other people, also.  I don’t remember the ALPA representatives that were
there.  There weren’t any ALPA lawyers, but there—an—an ALPA from our—

            Q.  Pilots.

            A.  union.  Pilots, yes.

            And Richard and I, Kelly, those two
gentlemen—oh, Kip Commodore, one of our assistant chiefs—chief pilots, and I
believe that was all in the room when were based—when we were talking.

            Richard
Lowe testified about what occurred at the meeting: 

            Q.  In this meeting, were they asking all of
you what happened?

            A.  It—it wasn’t geared towards that.  It was
more of, you know, how are you doing?  How are you feeling?  Are you okay? 
Wow, great job.  What do you need?  What can we do for you?

            Q.  Not what happened.

            A.  I—I really don’t recall that. . . . And I—I
think more than anything there was a concern for— for our wellbeing and—and
more along the lines of, hey, we’ll figure out what happened later.  What can
we do for you?  And so that’s—that’s what I seem to recall.

            Green’s
and Lowe’s testimony refute the plaintiffs’ claim that Kellner interviewed them
to discuss what occurred before, during, and after the accident.  Moreover,
consistent with Lowe’s testimony, Kellner stated, in his affidavit, that he
spoke briefly with each crew member and the deadheading pilots after the
accident, “but the purpose of these conversations was to express my concern for
their health and well-being. . . . I did not seek to uncover any details about
activities in the cockpit or what may have caused the accident, and none were
provided.”  

            Lowe’s
testimony confirms the plaintiffs’ claim that recognition plaques were awarded
to the crew and pilot members.  Lowe received “a recognition-type plaque that
was—that was given to me at the CEO exchange as well as the other crew members,
pilot members that were there.”  It is difficult to see how awarding
recognitions plaques to the crew and member pilots is evidence of hands-on
involvement in determining the cause of the crash or that Kellner has unique or
superior personal knowledge of the events surrounding the accident.  

            The
plaintiffs further argue that Kellner, as a board-member for the Air Transport
Association of America (“ATA”), has superior and unique knowledge as to
Continental’s implementation of operational and safety practices.  The
plaintiffs rely on the following ATA mission statement:

            ATA serves its member airlines and their
customers by assisting the airline industry in continuing to provide the
world’s safest system of transportation; transmitting technical expertise and
operational knowledge to improve safety, service and efficiency . . .

            The
plaintiffs contend that Kellner has unique and superior knowledge of how
Continental works with the ATA to provide the “world’s safest” system of
transportation and how Continental implements technical expertise and
operational knowledge to ensure the safety of its passengers.  

            In
his affidavit, Kellner states that his position “on the Board does not give me
any ‘superior or unique knowledge as to Continental’s implementation of
operational and safety practices’ as alleged by the plaintiffs.”  Kellner
further explained that Captain Don Gunther has direct responsibility for
implementation of operational and safety practices at Continental and also
serves as Continental’s representative on the ATA’s safety committee.  The
plaintiffs have not stated whether they have deposed Gunther or that he has not
or will not be able to provide the information they seek.  Kellner has
demonstrated that he does not have unique or superior knowledge regarding of
Continental’s implementation of operational and safety practices.

            The
plaintiffs also rely on Kellner’s statement about individual passengers and how
Continental will handle each case on a passenger-by-passenger basis:

We’ll work with each of the passengers individually to do
what’s best for them.  Obviously this has been a very difficult evening for
them, even if they weren’t injured or didn’t go to the hospital, and so we’ll
address that on a passenger-by-passenger basis.

            In
support of their mental anguish claims, the plaintiffs contend it is vital to
know what Kellner meant by this statement, particularly in consideration of
those passengers who suffer from mental anguish, but did not sustain serious
physical injuries.  They argue that Kellner is the only person who knows what
he meant by that statement, which imbues him with unique knowledge regarding
how Continental will handle the claims of each passenger.  However, the
relevant inquiry is what effect, if any, the statement has on a particular
passenger, not what Kellner subjectively intended by the utterance.  

            In
addition, the testimony that a corporate executive possesses knowledge of
company policies does not, without more, satisfy the first Crown Central
test because such evidence does not show that the executive has unique or
superior knowledge of discoverable information.  In re Alcatel USA, Inc.,
11 S.W.3d at 177; see also AMR Corp. v. Enlow, 926 S.W.2d 640, 641 (Tex.
App.—Fort Worth 1996, orig. proceeding) (holding testimony that AMR’s
president, CEO, and chairman of board would have ultimate authority over any
policy because he had “about all the authority he needs on most issues in
business” amounted to “nothing more than the simple, obvious recognition that
the highest-ranking corporate officer of any corporation has the ultimate
responsibility for all corporate decisions and falls far short of the [Crown
Central] standard”).[7] 


            Here,
Kellner has shown that he does not have unique or superior knowledge regarding
what occurred before and during the accident or the cause of the accident. 
Kellner stated that the information he gave at the press conference was
provided to him by other Continental employees; he provided the name of the
Continental employee who is its party representative to the NTSB investigation;
he did not discuss with the deadheading pilots what occurred before, during,
and after the accident; he has not received information about the cause of the
accident in the executive briefs; and he named the Continental employee who has
direct responsibility for the implementation of operational and safety
practices at Continental and serves as Continental’s representative on the ATA
safety committee.  See In re Daisy Manufacturing Company, 17 S.W.3d 654,
659 (Tex. 2000) (orig. proceeding) (per curiam) (explaining that even if Daisy
Manufacturing’s CEO were deposed, he had little first-hand information about
areas of inquiry).  

Less
Intrusive Methods

            The
plaintiffs argue, even if they failed to show that Kellner has unique or
superior knowledge, that there are no less intrusive methods or other discovery
has been insufficient to gain information regarding what Kellner meant by his
public statements or what he has learned about the cause of the accident.  The
requesting party’s burden is not perfunctorily met by any showing that the
party employed less-intrusive discovery methods.  Id. at 658.  Crown
Central Petroleum Corporation instructs the courts to measure whether the
discovering party made a reasonable effort to obtain discovery through
less-intrusive methods.  Id.  “Merely completing some less-intrusive
discovery does not trigger an automatic right to depose the apex official.”  Id. 


            The
plaintiffs assert that, in trying to find evidence about the cause of the
accident and Kellner’s statements, they have conducted the following discovery:
 (1) 110 requests for production; (2) 74 interrogatories; and (3) 11
depositions of pilots, crew and management of personnel of Continental,
totaling over 50 hours of deposition testimony.  

            Continental
asserts that while the plaintiffs have deposed some crew members and other
field personnel, they have not noticed the depositions of Continental’s
corporate representative, other individuals present in any meetings where
Kellner received information about the accident, other employees who are more
directly involved in supporting the ongoing NTSB investigation, or those
employees described by Kellner in his affidavit as having responsibility in the
particular areas of inquiry.  See id. (“Merely completing some less-intrusive
discovery does not trigger an automatic right to depose the apex official.”). 
Here, the plaintiffs have not shown that less intrusive methods are inadequate
to obtain the information they are seeking.  

            With
regard to the plaintiffs’ assertion that there is no one other than Kellner who
could testify as to what he meant by his various public statements, Continental
concedes that Kellner is best able to address his own subjective intent in
making his generalized public statements following the accident.  However, Kellner’s
subjective intent in making the subject public statements does not establish
anything regarding negligence, proximate cause, or damages.  The plaintiffs
have not shown a reasonable indication that deposing Kellner would lead to the
discovery of admissible evidence.  

Conclusion

The trial court abused its discretion by compelling
the apex deposition of Larry Kellner.  Accordingly, we conditionally grant
Continental’s petition and direct the trial court to set aside its October 26,
2009 order compelling Kellner’s deposition.  The writ will issue only if the
trial court fails to act in accordance with this opinion.  

 

                                                                                    

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

 

Panel consists of Chief Justice Hedges
and Justices Seymore and Sullivan. 









[1] On March
12, 2009, Continental moved for transfer and consolidation of all pending and
future cases pursuant to Texas Rule of Judicial Administration 13.  On May 7,
2009, the Multidistrict Litigation Panel granted Continental’s motion, and
designated the 11th District Court of Harris County as the Pretrial Court.  The
underlying proceeding is styled In re Continental Airlines Flight 1404,
MDL No. 2009-33036.  There are 29 plaintiffs in 14 cases consolidated into the
MDL proceeding.





[2] The order states verbatim:

            On the 26th day
of October 2009, the Court considered Plaintiffs’ Motion to Compel the
Deposition of Larry Kellner, Continental Airlines, Inc.’s Motion for Protective
Order, and Continental Airline, Inc.’s Motion to Quash the Deposition of Larry
Kellner.  All parties appeared by and through their representative counsel. 
The Court, after considering the pleadings, the motions, the sworn affidavit of
Larry Kellner, and the arguments by counsel, finds as follows:

            IT IS ORDERED
that Plaintiffs’ Motion to Compel the Deposition of Larry Kellner is GRANTED,
Defendant Continental Airlines, Inc.’s Motion for Protective Order is DENIED,
and Defendant Continental Airlines, Inc.’s Motion to Quash is GRANTED.

            The Court
acknowledges that Continental Airlines, Inc. may seek appellate review of this
order by way of mandamus.  In the event that Continental Airlines, Inc. files a
petition for writ of mandamus on or before November 16, 2009[,] then this
Court’s order granting Plaintiffs’ Motion to Compel the deposition of Larry
Kellner shall be stayed until the final disposition of all mandamus proceedings
related to this order.  In the event no petition for mandamus is filed on or
before November 16, 2009, then the deposition of Larry Kellner shall occur by
December 30, 2009.





[3] Federal law provides that the
NTSB investigates the accident:

(a) General.–(1) The National Transportation Safety Board shall
investigate or have investigated (in detail the Board prescribes) and establish
the facts, circumstances, and cause or probable cause of–

            (A) an
aircraft accident the Board has authority to investigate under section 1132 of
this title or an aircraft accident involving a public aircraft as defined by
section 40102(a)(37) of this title other than an aircraft operated by the Armed
Forces or by an intelligence agency of the United States; . . .

49
U.S.C.A. § 1131(a)(1)(A) (West 2007).  





[4] Federal regulations provide:

(a)  All investigations,
regardless of mode.  (1) The investigator-in-charge designates parties to
participate in the investigation.  Parties shall be limited to those persons,
government agencies, companies, and associations whose employees, functions,
activities, or products were involved in the accident or incident and who can
provide suitable qualified technical personnel actively to assist in the
investigation.  Other than the FAA in aviation cases, no other entity is
afforded the right to participate in Board investigations.

(b) Participants in the
investigation (i.e., party representatives, party coordinators, and/or
the larger party organization) shall be responsive to the direction of Board
representatives and may lose party status if they do not comply with their
assigned duties and activity proscriptions or instructions, or if they conduct
themselves in a manner prejudicial to the investigation.

49
C.F.R. § 831.11(a), (b).





[5] Kellner
further stated, in his affidavit, that he continued to receive periodic
“privileged” briefings from Continental’s General Counsel, Vice President of
Safety and other senior management and legal personnel about the accident,
status of the NTSB investigation, and the status of passenger claims and
litigation.  





[6]
“Deadheading” refers to those crew members who are travelling on an aircraft
free of charge but not working because they are located in the wrong place and
need to travel to take up their duties.  





[7] At the
hearing on the plaintiffs’ motion to compel, the trial court opined that “it is
reasonable to be able to ask the person in charge of the enterprise ultimate
questions about responsibility and safety issues and so forth.  That doesn’t
seem to have been what the Supreme Court has done in these cases.”  This
statement indicates that the trial court acknowledged controlling authority.