Petition for Writ of Mandamus Denied and Opinion filed
August 20, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-09-00548-CV

____________

 

IN RE IAN TAYLOR, Relator

 

 



 

ORIGINAL
PROCEEDING

WRIT OF MANDAMUS

 



 

O P I N I
O N

Ian Taylor filed a petition for writ of mandamus challenging
the trial court=s denial of Taylor=s motion to quash a deposition.  See
Tex. Gov=t Code Ann. ' 22.221 (Vernon 2004); see also
Tex. R. App. P. 52.  Because we conclude that the real party in interest,
Leticia Loya, met the standard for an apex deposition established under Crown
Central Petroleum Corporation v. Garcia, 904 S.W.2d 125 (Tex. 1995), we
deny relief.

                                                                   Background








This deposition dispute arises from a divorce proceeding
between Miguel and Leticia Loya.  As part of the divorce, Miguel and Leticia
are conducting an inventory of assets in the marital estate.  One of these
assets is stock awarded to Miguel, who is the president of Vitol, Inc.  Leticia
seeks to depose Taylor regarding valuation of this stock.  

Vitol, Inc. is one of more than 50 companies that constitute
the Vitol Group, a privately owned business that engages in petroleum
distribution and trading.  The Vitol Group also includes entities called the ATinsel Group@ and AStichting.@  

Taylor is described as Athe >President= of Vitol.@  Taylor says this is Aan outward facing title that, of
itself, confers no special status. . . .  It does, however, mean that I am the
public face of Vitol and play an important role in business development and
client relationships for the group.@  Taylor states that he is employed
by Vitol Broking Limited, and is a member of the board of directors of Vitol
Holding BV and Vitol Holding II SA.  All three entities are part of the Vitol
Group.  Miguel also is one of seven members of Vitol Holding II SA=s board of directors.  According to
Taylor, the Vitol Group as a whole is managed by Vitol Holding II SA=s board of directors.  

The Vitol employees who are United States citizens formed the
Tinsel Group for tax purposes.  Leticia seeks to depose Taylor regarding
valuation of Miguel=s stock held by the Tinsel Group, and other shares that were
placed in a trust for their children.[1]  

Leticia=s counsel filed a Motion for Issuance of Letters of Request
in Texas state court, which the trial judge signed.  On January 19, 2009, the
High Court of Justice, Queen=s Bench Division, acted on the Letter of Request.  That court
ordered Taylor=s deposition to proceed in London, where Taylor lives, and limited Taylor=s deposition to the following areas: 









1)        The nature and value of the
Loyas= shares of Vitol stock already issued and anticipated
to be issued including the most up to date information available as to
financial performance in the years ended 31 December 2007 and 31 December 2008 

2)        The relationships between the
various Vitol, Stichting, and Tinsel entities who are nominees of such shares,
in order to understand the incidents and security of such property 

3)        How, when, and why certain
classes of stock have been reclassified by the Vitol, Stichting, or Tinsel
entities 

4)        The difference in the various
classes of stock 

5)        The factors which will
determine when and for how much each of the share classes may pay dividends or
be redeemed 

6)        The
respondent=s power, as President of Vitol, Inc., to influence decisions concerning
the issuance of stock, redemption of stock, and payment of dividends on the
various share classes[.]

On February 16, 2009, Taylor filed a motion to quash in the
Texas trial court on grounds that the deposition is an impermissible apex
deposition.  On February 19, 2009, the High Court of Justice, Queen=s Bench Division, stayed Taylor=s deposition pending a decision in
Texas state court on the motion to quash.  

After hearings on April 3 and May 19, 2009, the trial judge
denied Taylor=s motion to quash and signed an order to that effect on May 19, 2009. 
Taylor now seeks mandamus relief from the trial court=s order denying the motion to quash
his deposition. 

                                                           Mandamus
Standard

Mandamus relief is available to correct a clear abuse of
discretion when there is no adequate remedy at law.  In re Team Rocket, L.P.,
256 S.W.3d 257, 259 (Tex. 2008) (orig. proceeding); Walker v. Packer,
827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding).








With respect to the resolution of fact issues or matters
committed to the trial court=s discretion, a reviewing court may not substitute its
judgment for that of the trial court.  Walker, 827 S.W.2d at 839.  On
the other hand, a trial court has no discretion in determining the law or in
applying the law to the facts.  E.g., Huie v. DeShazo, 922 S.W.2d 920,
927B28 (Tex. 1996) (orig. proceeding). 
Thus, a clear failure to analyze or apply the law correctly will constitute an
abuse of discretion.  Id.  

Mandamus is an appropriate remedy when a trial court allows
an apex deposition to go forward in violation of the standard governing such
discovery.  E.g., In re BP Prods. N. Am., Inc., No. 01-06-00613-CV, 2006
WL 2192546, at *2B3 (Tex. App.CHouston [1st Dist.] Aug. 4, 2006, orig. proceeding) (mem.
op.).  

                                                                      Analysis

The standard governing apex depositions originates in Crown
Central Petroleum Corporation, 904 S.W.2d at 128.  The Crown Central
guidelines apply A[w]hen a party seeks to depose a corporate president or other
high level corporate official and that official (or the corporation) files a
motion for protective order to prohibit the deposition accompanied by the
official=s affidavit denying any knowledge of
relevant facts . . . .@  Id. 








The trial court first must determine whether the party
seeking the deposition Aarguably [has shown] . . . that a high level official has
unique or superior personal knowledge of discoverable information.@  In re Daisy Mfg. Co., 17
S.W.3d 654, 656 (Tex. 2000) (orig. proceeding) (per curiam) (citing Crown
Cent., 904 S.W.2d at 128).  If the party seeking the deposition does not make
this showing, the trial court must A>first require the party seeking that
deposition to attempt to obtain the discovery through less intrusive methods.=@  Id. (quoting Crown Cent.,
904 S.W.2d at 128).  AThe discovering party may thereafter depose the apex official
if, after making a >good faith effort to obtain the discovery through less
intrusive methods,= the party shows that (1) there is a reasonable indication
that the official=s deposition is calculated to lead to the discovery of
admissible evidence, and (2) the less‑intrusive methods are
unsatisfactory, insufficient or inadequate.@  Id. at 657 (quoting Crown
Cent., 904 S.W.2d at 128); see also In re Alcatel, 11 S.W.3d 173,
176 (Tex. 2000) (orig. proceeding). 

I.         Applicability of the Crown Central Test 

We first must determine whether this is an apex deposition
situation.  Taylor asserts that he is not a director, officer or employee of
the companies or entities identified in the deposition request except for Vitol
Holding BV and Vitol Holding II SA.  He further states that, although he is
described as the APresident@ of Vitol, this is an Aoutward facing title@ and he is merely the Apublic face@ of Vitol.  Based on these
statements, Leticia argues that Taylor negated his claimed apex status.  We are
unpersuaded by this argument.  Although he attempts to downplay his job
responsibilities, Taylor states that he is a director of certain Vitol entities
and APresident@ of Vitol.  Taylor qualifies a Ahigh level official@ on this record. 








Next, we address the state of Taylor=s knowledge.  Taylor did not
completely disclaim Aany@ knowledge of relevant facts.  Instead, Taylor disclaimed
knowledge of certain particulars and stated that three other individuals have
more knowledge regarding Athe Tinsel entities@ than does Taylor.[2] 
Leticia contends that Taylor cannot invoke the Crown Central apex
standards because he has not disclaimed Aany@ knowledge of relevant facts.  We
agree with Taylor that Crown Central does not require apex officials to
assert total ignorance of all possible facets of a controversy.  See In re
BP Prods. N.A., Inc., 2006 WL 2192546 at * 4 (citing Alcatel, 11
S.W.3d at 179).  

Additionally, Letitia argues that Crown Central should
not apply because Miguel identified Taylor in discovery responses as a person
with knowledge of relevant facts.  Miguel=s characterization of Taylor is not
dispositive.[3]  This is not
a situation in which the AVitol Group@ or an individual Vitol entity listed Taylor as a fact
witness in litigation being conducted by that entity.  Miguel is litigating his
own divorce on his own behalf.  Miguel=s characterization of Taylor in
connection with Miguel=s divorce does not constitute an admission by the AVitol Group,@ a particular Vitol entity, or Taylor
himself regarding the state of Taylor=s knowledge.

Based on the assertions in Taylor=s affidavit, we conclude that Taylor
is a Ahigh-level official@ who has denied Aunique or superior knowledge of
discoverable information.@  See In re Daisy Mfg. Co., 17 S.W.3d at 656. 








II.        Determining Whether the Crown Central Standard Has Been
Satisfied

Having determined that the apex deposition standard applies
here, we now examine whether Leticia satisfied that standard so as to permit
Taylor=s deposition.  We first address
whether Leticia established that Taylor arguably has unique or superior
knowledge of discoverable information.  See Crown Cent., 904 S.W.2d
128.  We conclude that she has done so on this record.  

Miguel=s Vitol Holding II SA shares were converted into Tinsel Group
shares in 2006.  Tinsel also owns shares in Vitol Holding II SA.  Accordingly,
two shareholder agreements are relevant to Miguel=s stock ownership.  They are the
Vitol Holding II SA Shareholder=s Agreement and the Tinsel Group Shareholder Agreement.  The
agreements contain similar provisions.  Article 6.1 of each agreement
identifies certain Atermination events@ under which the shareholder is Adeemed@ to have offered his respective
shares for sale back to the company.  Divorce is one such Aevent.@[4]  Under Article 7.1 of each
agreement, each respective board Amay, at its sole discretion, decide
to redeem all or part of the Shares.  The proceeds of the sale or redemption,
as appropriate, shall be the percentage of the intrinsic value of each Share@ as determined by a formula
established in the shareholder agreements.[5]









Thus, the Loyas= divorce will trigger the liquidation
of their interest in the Tinsel sharesCthe largest asset in the marital
estate.[6]  Leticia
asserts that calculating the value of this stock is complicated by Vitol=s status as a private company, and
that shares have been transferred between Vitol entities and reclassified. 
Leticia contends that Taylor=s deposition is necessary to determine the true nature and
value of Miguel=s stock; how future stock distributions will be made; and how
future dividends and redemptions will be determined. 

Taylor stated in his affidavit that Miguel, Jeff Hepper and
Keith Swaby had more or superior knowledge of the Tinsel entities.  Leticia has
deposed all three.  Having reviewed their depositions, we conclude that the
trial court acted within its discretion and consistent with Crown Central
in allowing Taylor=s deposition to go forward.  

Miguel testified that he is not aware of an instance in which
an employee was divorced and the nonemployee spouse was awarded shares in
either Vitol Holding II SA or Tinsel Group.  Miguel testified that upon
termination, the shares would be converted to preferred shares and that,
although the stock reflects underlying assets of Vitol, the board of directors
has absolute power to make decisions regarding redemption of this stock. 
Miguel was unaware of any previous situations where Tinsel shares were
converted upon a termination event.  








Jeff Hepper, who is senior vice president of Vitol, Inc. and
is a member of the Vitol Holding II SA board of directors, testified that he is
not familiar with the legal structure of Tinsel Group, which holds legal title
to Vitol shares.  Hepper understood that there are different classes of shares
of Tinsel Group, but he Acouldn=t tell@ the difference between the different classes of shares or
even what classes of shares he owns.  In providing information to the firm that
was providing appraisals of Vitol and Tinsel Group, Hepper made an Aeducated guess@ about Vitol=s earnings.  

Hepper stated that Vitol Holding II SA=s board has discretion to determine
when to pay dividends or to make share redemptions.  In a termination event,
the value of the redeemed shares is not discounted in the case of a vested
shareholder; he did not know if the value of the redeemed shares held in trust
for the children of shareholders is discounted.  He did not know of an instance
in which a nonemployee spouse has been awarded Tinsel shares in a divorce.  The
intrinsic value of Leticia=s shares would be fixed when the Vitol Holding II SA board
deems redemptions.  Hepper did not know if there is a document at Tinsel that
governs how dividends and redemptions from Vitol payments are handled in a
termination event, but he Ahope[d] so.@  

Keith Swaby, a current vice president of Vitol, Inc. and
former treasurer and chief financial officer of Vitol SA, Inc., testified that
he is not aware of anyone in Tinsel who has tendered his shares for redemption
without having left the company.  Swaby has not been involved in the
calculation of the payoff to a nonemployee spouse who was award shares in a
divorce.  More specifically, in the case of an employee=s divorce, he was not familiar with
the provisions of the Shareholder=s Agreement relating to shares that
are awarded to a spouse, and he had no reason to have any knowledge regarding
any Vitol employee who may have gone through a divorce whose spouse was awarded
shares in Vitol.  If Leticia were to be awarded Vitol shares in the divorce,
Swaby does not know if such shares would be converted to preferred status or if
Leticia would be required to offer them for sale back to Tinsel.  However, the
Vitol Holding II SA board would be involved in the calculation to pay the
divorcing spouse for the redemption of the shares. 

 

 








With respect to Taylor=s knowledge, Swaby testified as
follows: 

Q.  All right.  Is it fair to say [Taylor]
is the most knowledgeable person on the planet to know about the operations and
details of Vitol and all of its various subsidiaries and affiliated companies?

                                                             *       
*        *

A.  Well, he=s knowledgeable in the company, probably not on the specifics of each
operation, no.  

                                                             *       
*        *

Q.  (By Mr. Tindall)  What individual on
earth would know more about Vitol than Ian Taylor?

A.  He
probably would be a good place to start.  

Swaby was not able to identify anyone who has more knowledge
of Vitol than Taylor.  Swaby further testified that an intrinsic value of
shares, or an allocation of retained earnings, is calculated annually, which
Taylor then reports to the shareholders:

Q.  Once the intrinsic value of one period
is determined, is it the company=s normal
procedure to publicize that, at least to someCsome of its employees, to let them know what it is?

A.  Yeah, I think there=sCthere=s aCMr. Taylor
issues a note to shareholders from time to time that state[s] either what the
actual or estimated earnings are for the year sometime after year-end.

Q.  And is there some backup data, some
schedule, some documentation supplied thatCthatCthat would back the figure up so that people can check
it out for themselves?

A.  We believe Mr. Taylor.

Q.  So your answer is?

A.  No. 









As stated above, there is no backup data for Taylor=s report on Vitol=s earnings.  Instead, the
shareholders rely solely on Taylor for this information.  This testimony
supports a determination that Taylor arguably has superior or unique knowledge
regarding Vitol=s financial performance as it relates to Miguel=s stock.  

Additionally, the record contains ten letters Taylor sent to
Miguel between 2001 and 2008; these include several annual shareholder letters
that enclosed statements of intrinsic value for Miguel=s Vitol Holding II SA shares for the
years 2001 through 2005, and the statements of intrinsic value for Miguel=s and Planck=s Tinsel Group shares for 2006 and
2007.  The statements of intrinsic value reflect the various classes of shares,
the number of shares, prior balance, profit allocation, dividend paid, addition
of shares, redemption/sales/reclassification, and year-end balance.  Other
letters announce the issuance of new Vitol Holding II SA shares; invite Miguel
to participate in a specific number of those new shares at a certain price; and
advise that Taylor is available to answer any questions.  

These circumstances distinguish this case from others in
which apex depositions have not been allowed.  See In re El Paso
Healthcare Sys., 969 S.W.2d 68 (Tex. App.CEl Paso 1998, orig. proceeding)
(plaintiff was unable to show that CEO=s knowledge of understaffing was unique
or superior to that of other company officials); AMR Corp. v. Enlow, 926
S.W.2d 640, 644 (Tex. App.CFort Worth 1996, orig. proceeding) (plaintiffs sought CEO
deposition regarding policy decisions about alcohol service and flight
attendant training; evidence showed no basis for deposing CEO beyond his
ultimate responsibility for all corporate decisions).  Based on the
depositions of Miguel, Hepper, and Swaby, and the letters from Taylor, Leticia
has established that Taylor arguably has unique or superior knowledge
sufficient to justify his deposition on the specific issues delineated by the
High Court of Justice, Queen=s Bench Division.  

                                                                    Conclusion








Based on our review of the record, we hold that Taylor has
not established an abuse of discretion by the trial court because Leticia
showed that Taylor arguably has unique or superior knowledge about the
deposition topics delineated by the High Court of Justice, Queen=s Bench Division.  

Accordingly, we deny Taylor=s petition for writ of mandamus. 

 

 

/s/        William J. Boyce

  Justice

 

 

 

Panel
consists of Chief Justice Hedges, and Justices Brown and Boyce. 









           [1] 
The trust formed by
Miguel is called the ANova Trust.@  Another trust for the Vitol
shareholders= children is called Planck
Investments, L.P. 





           [2]  Taylor=s affidavit, attached to his motion to quash, included
the following assertions:

 

Furthermore, I am not Mr. Loya=s >line manager= and Mr. Loya does not report to me.  Moreover, I am
not directly involved in the management of the US elements of Vitol (which is
Mr. Loya=s area of responsibility) or in the separate
shareholding structures that relate to the US elements of Vitol.  These are all
matters for US shareholders, of which Mr. Loya is one.  Mr. Loya does not
report to any one individual within the Vitol organisation in particular.

                                                                *       
*        *

Also, I would like to make it clear that I have no
interest of any kind (direct or indirect) in either of the Tinsel entities
referred to in the Letter of Request.  In fact, I know very little about these
entities other than that they have been established by and for US shareholders
in Vitol.

                                                                *       
*        *

As regards the request that I be deposed:

 

I understand that I will, apparently, be asked about
relationships between various Vitol companies, with the primary focus being on
the Tinsel entities.  As I have already said, however, I have no involvement in
these entities.  Accordingly, if the Tinsel entities are intended to be a focus
of the deposition, I am, quite simply, the wrong person to appear as a witness;

 

There are at least three individuals in the US who are
likely to know far more than me about the Tinsel entities because they have, I
believe, been involved in the establishment and operation of the Tinsel
structure; they are Mr Loya himself, Mr Jeff Hepper and Mr Keith Swaby.  All
three are based in Houston, Texas.  Furthermore, two of these individuals B Mr Loya and Mr Hepper B are of equal seniority to me within the Vitol organisation and will
have the same degree of knowledge about the organisation as a whole . . . .





           [3] 
Taylor contends the trial judge erred because the trial judge orally denied the motion at
the hearing after asking whether Taylor was listed as a person with knowledge
of relevant facts and learning that he was so listed.  The order denying the
motion to quash does not specify any grounds.  Accordingly, we address
application of the Crown Central test. 





           [4] 
In addition to a shareholder=s divorce,
other Atermination events@
include bankruptcy; judicial suspension of payment; death of a shareholder who
is a natural person; disability; the dissolution or liquidation of a
shareholder that is not a natural person; any attachment levied on shares held
by a shareholder; a change of ownership of shares that occurs otherwise than by
transfer; a shareholder=s loss of free control or free disposal his shares;
and termination of the shareholder=s
employment with Vitol Group or Tinsel for any reason. 





           [5] 
Any common Tinsel shares awarded to Leticia in the divorce will be converted to
preferred Tinsel shares.  Common shares participate in the appreciation of the
company, while preferred shares do not.  Dividends are paid on common shares
and preferred shares are redeemed or repurchased by the company.  It is within
the Vitol Holding II SA board=s discretion to
decide whether to redeem shares.  When Vitol Holding II SA redeems its shares
owned by Tinsel, it pays Tinsel.  In the case of common shares, the Tinsel
Group board will decide whether to pay a dividend.  In the case of preferred
shares, Tinsel redeems its shares based on the redemption value of the
underlying Vitol Holding II SA shares. 





           [6] 
On December 31, 2007, the Loyas= shares and
those of the Nova Trust, according to Tinsel, had an intrinsic value of almost
$140,000,000; on March 18, 2008, dividends of approximately $12,700,000 were
paid on the stock.