**In re CONTINENTAL AIRLINES, INC., Relator.**

**No. 14–09–00952–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 4, 2010.

George Lucas Ashley, John H. Martin, Dallas, TX, Juan Carlos Garcia, Sr., Morgan Lindsey Gaskin, Houston, TX, for Relator.

Jason A. Gibson, Houston, TX, for Real Party in Interest.

Panel consists of Chief Justice HEDGES and Justices SEYMORE and SULLIVAN.

## OPINION

CHARLES W. SEYMORE, Justice.

November 12, 2009, relator, Continental Airlines, Inc., filed a petition for writ of

mandamus in this Court. *See* Tex. Gov't Code Ann. § 22.221 (Vernon 2004); *see also* Tex.R.App. P. 52. In the petition, relator asks this Court to compel the Honorable Mike Miller, presiding judge of the 11th District Court of Harris County, to set aside his October 26, 2009 order compelling the deposition of Larry Kellner, Chief Executive Officer and Chairman of the Board of Directors of Continental. We conditionally grant the petition.

## BACKGROUND

On December 20, 2008, Continental Flight 1404 was involved in an accident when it departed from the runway during takeoff from the Denver International Airport. There were no fatalities, but 37 passengers and crew were transported to the hospital.

Larry Kellner, Continental's Chief Executive Officer and Chairman of the Board of Directors, gave a statement and answered questions at a press conference following the accident. On December 22, 2008, Kellner sent a letter to the passengers expressing his concern for the accident. The plaintiffs brought suit against Continental for negligence.[1]

On October 6, 2009, the plaintiffs noticed the deposition of Kellner for November 5, 2009. On October 9, 2009, Continental filed a motion to quash the deposition, arguing that Kellner has no unique or superior knowledge of discoverable information and the plaintiffs have not attempted to obtain discovery through less intrusive methods. *See Crown Cent. Petroleum Corp. v. Garcia,* 904 S.W.2d 125 (Tex.1995) (orig. proceeding). Continental also objected to the time and place set forth in

the notice because Kellner had prior commitments requiring him to be out of town on that date.

On October 9, 2009, the plaintiffs moved to compel Kellner's deposition, arguing that he has unique or superior knowledge of discoverable information as shown by the following: (1) Kellner immediately briefed media members on details of the crash; (2) Kellner stated, on numerous occasions, he would learn the cause of the crash to prevent future crashes; (3) Kellner sent personal letters to Flight 1404 passengers after the crash; (4) Kellner interviewed the deadheading pilots aboard Flight 1404 and personally awarded commendation plaques to crew and flight members; and (5) Kellner, who serves on the Board of Directors for Air Transport Association of America ("ATA"), an airline industry organization dedicated to ensuring the safety of airline passengers, has superior knowledge as to Continental's implementation of ATA's policies. On October 19, 2009, Continental filed a motion for protective order and response to the motion to compel, with Kellner's affidavit in which he testified that he has no unique or superior knowledge.

On October 26, 2009, the trial court held a hearing on the plaintiff's motion to compel and Continental's motion for protection. The trial court granted the motion to compel Kellner's deposition, and orally stated that the deposition was limited to two hours and to actions and statements by Kellner relating to the crash of Flight 1404. On October 26, 2009, the trial court signed the order granting the motion to compel, denying the motion for protective order, and granting the motion to quash.

---

1. On March 12, 2009, Continental moved for transfer and consolidation of all pending and future cases pursuant to Texas Rule of Judicial Administration 13. On May 7, 2009, the Multidistrict Litigation Panel granted Continental's motion, and designated the 11th District Court of Harris County as the Pretrial Court. The underlying proceeding is styled *In re Continental Airlines Flight 1404,* MDL No. 2009–33036. There are 29 plaintiffs in 14 cases consolidated into the MDL proceeding.

However, the trial court did not mention the above limitation on the deposition in its order.[2]

## MANDAMUS STANDARD OF REVIEW

To be entitled to extraordinary relief in a writ of mandamus, the relator must show the trial court clearly abused its discretion and there is no adequate remedy by appeal. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 259 (Tex.2008) (orig. proceeding). A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law, or if it clearly fails to correctly analyze or apply the law. *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex.2005) (orig. proceeding) (per curiam); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). Mandamus is an appropriate remedy when a trial court allows an apex deposition to go forward in violation of the standard governing such discovery. *E.g., In re Prods. N. Am., Inc.*, No. 01–06–00613–CV, 2006 WL 2192546, at *2–3 (Tex.App.-Houston [1st Dist.] Aug. 4, 2006, orig. proceeding) (mem. op.).

## CROWN CENTRAL GUIDELINES

The standard governing apex depositions originates in *Crown Central Petroleum Corporation*, 904 S.W.2d at 128.

The *Crown Central* guidelines apply "[w]hen a party seeks to depose a corporate president or other high level corporate official and that official (or corporation) files a motion for protective order to prohibit the deposition accompanied by the official's affidavit denying any knowledge of facts...." *Id.* A party initiates the *Crown Central* guidelines by moving for protection and filing the corporate official's affidavit denying any knowledge of relevant facts. *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 175 (Tex.2000) (orig. proceeding).

"The trial court evaluates the motion first by deciding if the party seeking the deposition has 'arguably shown that the official has any unique or superior knowledge of discoverable information.'" *Id.* at 175–76 (quoting *Crown Cent. Petroleum Corp.*, 904 S.W.2d at 128). "'If the party seeking the deposition cannot show that the official has any unique or superior knowledge of discoverable information, the trial court should' not allow the deposition to go forward without a showing, after a good faith effort to obtain the discovery through less intrusive means, '(1) that there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of dis-

2. The order states verbatim:

On the 26th day of October 2009, the Court considered Plaintiffs' Motion to Compel the Deposition of Larry Kellner, Continental Airlines, Inc.'s Motion for Protective Order, and Continental Airline, Inc.'s Motion to Quash the Deposition of Larry Kellner. All parties appeared by and through their representative counsel. The Court, after considering the pleadings, the motions, the sworn affidavit of Larry Kellner, and the arguments by counsel, finds as follows: IT IS ORDERED that Plaintiffs' Motion to Compel the Deposition of Larry Kellner is GRANTED, Defendant Continental Airlines, Inc.'s Motion for Protective Order is DENIED, and Defendant Continental Airlines, Inc.'s Motion to Quash is GRANTED.

The Court acknowledges that Continental Airlines, Inc. may seek appellate review of this order by way of mandamus. In the event that Continental Airlines, Inc. files a petition for writ of mandamus on or before November 16, 2009[,] then this Court's order granting Plaintiffs' Motion to Compel the deposition of Larry Kellner shall be stayed until the final disposition of all mandamus proceedings related to this order. In the event no petition for mandamus is filed on or before November 16, 2009, then the deposition of Larry Kellner shall occur by December 30, 2009.

covery are unsatisfactory, insufficient or inadequate.'" *Id.* at 176 (quoting *Crown Cent. Petroleum Corp.,* 904 S.W.2d at 128).

In *In re Alcatel USA,* the Texas Supreme Court recognized that these guidelines could be read as requiring trial courts to undertake two hearings and issue two orders. *Id.* "We recognize that these guidelines could be read as requiring trial courts to undertake two hearings and issue two orders: First, a hearing on whether to grant a protective order and, if one is granted, then a second hearing, after less intrusive methods of discovery have been explored, to determine whether the protective order should be dissolved." *Id.* Therefore, a "mechanical" application of the *Crown Central* guidelines is not necessary when the parties have already undertaken extensive discovery and the court has sufficient information to consider both prongs of the guidelines. *Id.*

## ANALYSIS

### Unique or Superior Knowledge

Continental asserts that it met its burden for invoking the apex procedure set forth in *Crown Central.* In his affidavit, Kellner testified, in relevant part:

> ... While I have knowledge of some facts relating to the accident by reason of my position as CEO, I do not possess any unique or superior personal knowledge beyond that of other senior management personnel at Continental who are involved in the day-to-day management of the airline's operations generally and who were involved in the response activities as a result of the accident specifically.

The plaintiffs claim they seek to depose Kellner because he has first-hand knowledge of relevant facts such as information about the events leading up to and during the crash of Flight 1404, and how Continental planned to handle passengers' claims and prevent similar crashes in the future. Continental argues that it is not sufficient to show that Kellner has unique or superior knowledge of some facts or matters concerning the subject matter, but of facts or matters relevant to the contested fact issues of the litigation, i.e., whether Continental's negligence, if any, proximately caused the accident, and what injuries and damages, if any, each plaintiff sustained.

The plaintiffs contend that Kellner began his hands-on involvement when he held a press conference just hours after the crash at which he stated that Continental "will do whatever we can to learn the cause of this accident so that we can prevent a recurrence at Continental or at any other airline."

At the press conference, Kellner generally stated that Continental "will do everything we can for the passengers, their families, and our coworkers." Kellner further recited the basic facts of the accident, that a number of injuries had been reported, and passengers and crew had been transported to area hospitals. Kellner also stated that Continental was mobilizing its "Accident Go Team," which is comprised of Continental experts—people from safety, air traffic control, engineering, maintenance, and flight operations—to assist in the investigation. Kellner concluded his statement by saying: "We will continue to do everything we can for the passengers, crew, and their families. We will also do whatever we can to learn the cause of this accident so that we can prevent a reoccurrence at Continental...."

In response to questions at the press conference, Kellner stated:

- "We'll work with each of the passengers individually to do what's best for them. Obviously this has been a very difficult evening for them, even if they weren't injured and didn't go to the hospital, and so we'll address that on a passenger-by-passenger basis."

• "I know at this time, I've given you all the facts I know. As I mentioned, we'll have our Go Team going up there later this morning. A few hours, they'll leave here. We'll work with the NTSB and there'll be a full and thorough investigation."

• "Again, all we know is that it was taking off[.] It was about 6:00 p.m. Mountain Standard Time and that it veered off the runway, slides were deployed, but we're not really ... Again, we'll do a full investigation. NTSB will do a full—will lead a full investigation. We'll assist with that; and as those facts come out, we'll give them to you."

• "I don't want to go into too much of it and what was in the weather there. There's nothing specific that's come up on the weather as far as snow or those type [sic] of items. But I really want to let the investigation more [sic] forward to figure out what happened as far as the cause of the accident. But there's nothing specific I'd comment on the weather at this moment."

In his affidavit, Kellner stated that the information he provided at the press conference was not unique or superior individual knowledge because it was given to him by other individuals at Continental. Moreover, Continental argues that none of Kellner's public statements made after the accident have anything to do with whether the flight crew acted negligently, or whether the passengers actually sustained any injuries in the accident.

The plaintiffs further assert that the December 22, 2008 letter sent after the crash to each passenger reiterates Kellner's involvement. The December 22, 2008 letter states:

Let me begin by expressing my deep personal concern for the distressing experience you had as a passenger aboard our flight 1404 on December 20, 2008. We regret that you had to go through this experience and are working diligently with the National Transportation Safety Board to determine the cause of the accident and to help make sure that something like this never again occurs at Continental or any other airline.

I would like to personally thank you for your quick response during the evacuation of the aircraft and apologize for what you had to go through. The safety of our passengers and crew is our highest priority.

On behalf of my co-workers at Continental, please allow me to express once again my deepest regret for your experience on board flight 1404.

The plaintiffs contend that the information Kellner states he intends to uncover while working with the NTSB is discoverable because it pertains directly to the basis of their claims. In this affidavit, however, Kellner stated that he has no unique or personal knowledge of the investigation into the cause of the accident. Kellner explained that the NTSB, not Continental, is conducting the official investigation into the cause of the accident, and Continental continues to cooperate with the NTSB investigation.

Federal law provides that the NTSB, not Continental, is to conduct the investigation of the accident, and will determine the cause or probable cause of the accident.[3] Continental, as a party designated

---

3. Federal law provides that the NTSB investigates the accident:

> (a) **General.**—(1) The National Transportation Safety Board shall investigate or have investigated (in detail the Board prescribes)

and establish the facts, circumstances, and cause or probable cause of—

> (A) an aircraft accident the Board has authority to investigate under section 1132 of this title or an aircraft accident involving a public aircraft as defined by section

by the NTSB to participate in the investigation, is prohibited from conducting its own investigation into the cause of the accident during the pendency of the NTSB investigation.[4] Here, Continental is not conducting the investigation to determine the probable cause of the accident.

Moreover, Kellner stated that Toby Carroll is Continental's representative relative to the NTSB investigation. The plaintiffs have not stated whether they have taken Carroll's deposition or, if so, that they were unable to elicit the information they are seeking. Therefore, Kellner has shown that he does not have unique or superior knowledge relative to the cause of the accident.

The plaintiffs further argue that the information and facts Kellner has learned about the cause of the accident in executive briefs provide him with unique and superior knowledge. They assert that the deposition testimony of Continental's chief pilot shows that based on Continental's standard operating procedure, Kellner received executive briefs about "what's going on and what's happening in this case." Andrew Jost testified:

Q. Do you know anybody that's talked to Mr. Kellner personally about this crash?

A. No.

Q. Not that it hasn't happened; you just don't know about it?

A. Correct.

Q. Would Mr. Kellner—based on the policies and procedures that you know that are in place internally at Continental Airlines, Mr. Kellner would have a pretty good idea of what's going on and what's happened in this case, don't you think?

\* \* \*

A. Well, I'm sure Mr. Kellner has received a executive brief or—or some briefing in some fashion.

Q. (BY MR. GIBSON) It is standard operating procedure of Continental for—for Mr. Kellner or the CEO of—of the airline to receive an—executive summary—

\* \* \*

Q. (BY MR. GIBSON)—when something like this happens?

A. I—I'm sure it is.

Q. And what does an executive summary consist of?

\* \* \*

A. Well, in my opinion, it would be just the—the facts as we know them and the circumstances surrounding the—the incident, accident, whatever the situation was.

40102(a)(37) of this title other than an aircraft operated by the Armed Forces or by an intelligence agency of the United States;
. . .
49 U.S.C.A. § 1131(a)(1)(A) (West 2007).

4. Federal regulations provide:
(a) *All investigations, regardless of mode.* (1) The investigator-in-charge designates parties to participate in the investigation. Parties shall be limited to those persons, government agencies, companies, and associations whose employees, functions, activities, or products were involved in the accident or incident and who can provide

suitable qualified technical personnel actively to assist in the investigation. Other than the FAA in aviation cases, no other entity is afforded the right to participate in Board investigations.
(b) Participants in the investigation (*i.e.,* party representatives, party coordinators, and/or the larger party organization) shall be responsive to the direction of Board representatives and may lose party status if they do not comply with their assigned duties and activity proscriptions or instructions, or if they conduct themselves in a manner prejudicial to the investigation.
49 C.F.R. § 831.11(a), (b).

Q. (BY MR. GIBSON) Do you know who's responsible for preparing that brief?

A. No.

Q. Have you reviewed the executive brief in this case that was given to Mr. Kellner?

\* \* \*

A. I—I have—I can't even say that it exits. I'm just thinking it does, so. . . .

In his affidavit, Kellner states, in the days immediately following the accident, that he received briefing about the accident, "primarily related to the status and effectiveness of the passenger and family assistance efforts in Denver and Houston, the general health and well-being of the passengers and crew, and Continental's media response to the accident."[5] Therefore, he did not acquire any unique or superior knowledge about the cause of the accident as a result of post-accident briefings. A review of Jost's testimony shows that he has never reviewed an executive brief and that he does not know what information an executive brief contains. Therefore, Jost's testimony does not contradict Kellner's statement that no unique or superior personal knowledge has been acquired through these briefings.

The plaintiffs further claim that Kellner continued to take an active role in learning the details of what caused the accident when he interviewed the deadheading pilots on Flight 1404, Richard Lowe and Richard Green.[6] According to the plaintiffs, when Lowe and Green arrived back in Houston, Kellner met with them to discuss what occurred before, during, and after the crash. Kellner also awarded recognition plaques to the crew and pilot members, which evidences Kellner's "hands on" involvement.

Todd Green testified regarding the identity of those who attended the meeting, but did not recite what was said at the meeting:

A. And there was a—a brief—I should say a short debrief that was agreed upon there at the airport.

\* \* \*

Q. Let's talk about that meeting when you got back to Houston. When was that?

\* \* \*

Q. And Mr. Kelleher [sic]?

A. He was there briefly. He was there—met the flight, and he did come in and—and talk to us once or twice. He talked to everyone on the airplane initially.

But I did meet with him. There may have been some other people, also. I don't remember the ALPA representatives that were there. There weren't any ALPA lawyers, but there—an—an ALPA from our—

Q. Pilots.

A. union. Pilots, yes.

And Richard and I, Kelly, those two gentlemen—oh, Kip Commodore, one of our assistant chiefs—chief pilots, and I believe that was all in the room when were based—when we were talking.

---

**5.** Kellner further stated, in his affidavit, that he continued to receive periodic "privileged" briefings from Continental's General Counsel, Vice President of Safety and other senior management and legal personnel about the accident, status of the NTSB investigation, and the status of passenger claims and litigation.

**6.** "Deadheading" refers to those crew members who are travelling on an aircraft free of charge but not working because they are located in the wrong place and need to travel to take up their duties.

Richard Lowe testified about what occurred at the meeting:

Q. In this meeting, were they asking all of you what happened?

A. It—it wasn't geared towards that. It was more of, you know, how are you doing? How are you feeling? Are you okay? Wow, great job. What do you need? What can we do for you?

Q. Not what happened.

A. I—I really don't recall that.... And I—I think more than anything there was a concern for—for our wellbeing and—and more along the lines of, hey, we'll figure out what happened later. What can we do for you? And so that's—that's what I seem to recall.

Green's and Lowe's testimony refute the plaintiffs' claim that Kellner interviewed them to discuss what occurred before, during, and after the accident. Moreover, consistent with Lowe's testimony, Kellner stated, in his affidavit, that he spoke briefly with each crew member and the deadheading pilots after the accident, "but the purpose of these conversations was to express my concern for their health and wellbeing.... I did not seek to uncover any details about activities in the cockpit or what may have caused the accident, and none were provided."

Lowe's testimony confirms the plaintiffs' claim that recognition plaques were awarded to the crew and pilot members. Lowe received "a recognition-type plaque that was—that was given to me at the CEO exchange as well as the other crew members, pilot members that were there." It is difficult to see how awarding recognitions plaques to the crew and member pilots is evidence of hands-on involvement in determining the cause of the crash or that Kellner has unique or superior personal knowledge of the events surrounding the accident.

The plaintiffs further argue that Kellner, as a board-member for the Air Trans-port Association of America ("ATA"), has superior and unique knowledge as to Continental's implementation of operational and safety practices. The plaintiffs rely on the following ATA mission statement:

ATA serves its member airlines and their customers by assisting the airline industry in continuing to provide the world's safest system of transportation; transmitting technical expertise and operational knowledge to improve safety, service and efficiency ...

The plaintiffs contend that Kellner has unique and superior knowledge of how Continental works with the ATA to provide the "world's safest" system of transportation and how Continental implements technical expertise and operational knowledge to ensure the safety of its passengers.

In his affidavit, Kellner states that his position "on the Board does not give me any 'superior or unique knowledge as to Continental's implementation of operational and safety practices' as alleged by the plaintiffs." Kellner further explained that Captain Don Gunther has direct responsibility for implementation of operational and safety practices at Continental and also serves as Continental's representative on the ATA's safety committee. The plaintiffs have not stated whether they have deposed Gunther or that he has not or will not be able to provide the information they seek. Kellner has demonstrated that he does not have unique or superior knowledge regarding of Continental's implementation of operational and safety practices.

The plaintiffs also rely on Kellner's statement about individual passengers and how Continental will handle each case on a passenger-by-passenger basis:

We'll work with each of the passengers individually to do what's best for them. Obviously this has been a very difficult

evening for them, even if they weren't injured or didn't go to the hospital, and so we'll address that on a passenger-by-passenger basis.

In support of their mental anguish claims, the plaintiffs contend it is vital to know what Kellner meant by this statement, particularly in consideration of those passengers who suffer from mental anguish, but did not sustain serious physical injuries. They argue that Kellner is the only person who knows what he meant by that statement, which imbues him with unique knowledge regarding how Continental will handle the claims of each passenger. However, the relevant inquiry is what effect, if any, the statement has on a particular passenger, not what Kellner subjectively intended by the utterance.

■ In addition, the testimony that a corporate executive possesses knowledge of company policies does not, without more, satisfy the first *Crown Central* test because such evidence does not show that the executive has unique or superior knowledge of discoverable information. *In re Alcatel USA, Inc.*, 11 S.W.3d at 177; *see also AMR Corp. v. Enlow*, 926 S.W.2d 640, 641 (Tex.App.-Fort Worth 1996, orig. proceeding) (holding testimony that AMR's president, CEO, and chairman of board would have ultimate authority over any policy because he had "about all the authority he needs on most issues in business" amounted to "nothing more than the simple, obvious recognition that the highest-ranking corporate officer of any corporation has the ultimate responsibility for all corporate decisions and falls far short of the [*Crown Central*] standard").[7]

Here, Kellner has shown that he does not have unique or superior knowledge regarding what occurred before and during the accident or the cause of the accident. Kellner stated that the information he gave at the press conference was provided to him by other Continental employees; he provided the name of the Continental employee who is its party representative to the NTSB investigation; he did not discuss with the deadheading pilots what occurred before, during, and after the accident; he has not received information about the cause of the accident in the executive briefs; and he named the Continental employee who has direct responsibility for the implementation of operational and safety practices at Continental and serves as Continental's representative on the ATA safety committee. *See In re Daisy Manufacturing Company*, 17 S.W.3d 654, 659 (Tex.2000) (orig. proceeding) (per curiam) (explaining that even if Daisy Manufacturing's CEO were deposed, he had little first-hand information about areas of inquiry).

### Less Intrusive Methods

■ The plaintiffs argue, even if they failed to show that Kellner has unique or superior knowledge, that there are no less intrusive methods or other discovery has been insufficient to gain information regarding what Kellner meant by his public statements or what he has learned about the cause of the accident. The requesting party's burden is not perfunctorily met by any showing that the party employed less-intrusive discovery methods. *Id.* at 658. *Crown Central Petroleum Corporation* instructs the courts to measure whether the discovering party made a reasonable effort to obtain discovery through less-intrusive methods. *Id.* "Merely completing some

---

7. At the hearing on the plaintiffs' motion to compel, the trial court opined that "it is reasonable to be able to ask the person in charge of the enterprise ultimate questions about responsibility and safety issues and so forth. That doesn't seem to have been what the Supreme Court has done in these cases." This statement indicates that the trial court acknowledged controlling authority.

less-intrusive discovery does not trigger an automatic right to depose the apex official." *Id.*

The plaintiffs assert that, in trying to find evidence about the cause of the accident and Kellner's statements, they have conducted the following discovery: (1) 110 requests for production; (2) 74 interrogatories; and (3) 11 depositions of pilots, crew and management of personnel of Continental, totaling over 50 hours of deposition testimony.

Continental asserts that while the plaintiffs have deposed some crew members and other field personnel, they have not noticed the depositions of Continental's corporate representative, other individuals present in any meetings where Kellner received information about the accident, other employees who are more directly involved in supporting the ongoing NTSB investigation, or those employees described by Kellner in his affidavit as having responsibility in the particular areas of inquiry. *See id.* ("Merely completing some less-intrusive discovery does not trigger an automatic right to depose the apex official."). Here, the plaintiffs have not shown that less intrusive methods are inadequate to obtain the information they are seeking.

With regard to the plaintiffs' assertion that there is no one other than Kellner who could testify as to what he meant by his various public statements, Continental concedes that Kellner is best able to address his own subjective intent in making his generalized public statements following the accident. However, Kellner's subjective intent in making the subject public statements does not establish anything regarding negligence, proximate cause, or damages. The plaintiffs have not shown a reasonable indication that deposing Kellner would lead to the discovery of admissible evidence.

## CONCLUSION

The trial court abused its discretion by compelling the apex deposition of Larry Kellner. Accordingly, we conditionally grant Continental's petition and direct the trial court to set aside its October 26, 2009 order compelling Kellner's deposition. The writ will issue only if the trial court fails to act in accordance with this opinion.